484 So.2d 976 (1986)
Ronald DOBSON, Plaintiff-Appellant,
v.
AETNA CASUALTY AND SURETY COMPANY, Defendant-Appellee.
No. 84-1112.
Court of Appeal of Louisiana, Third Circuit.
March 5, 1986.
*977 Mayer, Smith & Roberts, Mark A. Goodwin, Shreveport, for defendant-appellant-appellee.
Thomas & Dunahoe, Edwin Dunahoe, Natchitoches, for plaintiff-appellee-appellant.
*978 Richard A. Bailly, Monroe, Stafford, Stewart & Potter, Russell L. Potter, Alexandria, for defendant-appellee.
Before STOKER, DOUCET and YELVERTON, JJ.
YELVERTON, Judge.
This personal injury damage suit is just reaching us from a 1978 accident. One of several reasons for the delay is that a declaratory action intervened, which went to our Supreme Court to resolve questions about the uninsured motorist coverages. The case on the merits was then tried at the district court, some issues being decided by a jury and other issues by the trial court. The jury awarded plaintiff, Ronald Dobson, $620,724.05 in damages, and the district judge cast Southern American Insurance Company, an uninsured motorist carrier, with statutory penalties and attorney's fees totaling $146,886.88.
The case is now before us contesting these awards, as well as other rulings handed down during this litigation. Before discussing all of these issues, we will identify the parties and explain why they were in the lawsuit, and we will describe the judgment that was rendered.
This case happened in April 1978 when Ronald Dobson, then 26 years old, was driving a small pickup truck on a state highway in Bienville Parish and another vehicle out of control, with defendant Randy Walker at the wheel, hit Dobson's truck, seriously and permanently injuring him. Dobson sued Randy Walker and his insurer, Commercial Union Insurance Company. In time, plaintiff named three other insurers as defendants: Aetna Casualty & Surety Company, the uninsured motorist insurer of the small pickup plaintiff was driving; Southern American Insurance Company, the umbrella uninsured motorist insurer of the pickup truck; and Northeastern Fire Insurance Company of Pennsylvania, another umbrella UM carrier insuring the pickup. From these three defendants plaintiff sought uninsured motorist benefits, as well as penalties and attorney's fees.
The pickup truck being driven by Dobson was leased by his employer, Dobson Pulpwood Company, Inc., a business owned by Dobson's father. Aetna provided UM coverage on this pickup for $100,000 limits. Southern American had written an umbrella liability policy covering the pickup for $1,000,000. Northeastern Fire Insurance Company had written an umbrella policy covering the pickup for $2,000,000. Southern American and Northeastern filed suits seeking a declaratory judgment concerning the existence of UM coverage under their respective policies. The Supreme Court ruled in favor of Ronald Dobson against these two insurers finding that uninsured motorist coverage existed under both policies. Southern American Insurance Company v. Dobson, 441 So.2d 1185 (La. 1983).
When the case went to trial on the merits, two UM insurers, Aetna and Northeastern, were no longer in litigation: Aetna had paid its policy limits and was out; Northeastern was in liquidation in the State of Pennsylvania, and its attorneys had withdrawn. Only Walker, Commercial Union and Southern American remained as represented defendants.
The case was tried. The court signed a judgment awarding Ronald Dobson $620,724.05 against Randy Walker, with legal interest from date of judicial demand until paid. The judgment also awarded Ronald Dobson $5,000 against Commercial Union, Walker's insurer, the extent of its liability coverage, and adjudged that Southern American's ultimate liability to Dobson was to be reduced by this $5,000, as well as the $100,000 paid by Aetna before trial. Finding Southern American arbitrary and capricious in its handling of its UM responsibilities to Dobson, the trial judge gave judgment in favor of Dobson against Southern American for a 12% penalty on $515,724.05 (Southern American's liability after taking into account Commercial Union's obligation for $5,000, and Aetna's payment of $100,000), or $61,886.88, and $85,000 for attorney's fees. The judgment also made provision *979 for the expert witness fees of six physicians, fixing them and charging the fees to costs, ranging from a low of $250 to a high of $1,500. The court later assessed court costs to be paid two-thirds by Southern American and one-third by Commercial Union.
Southern American appealed raising the following issues:
1) whether uninsured motorist coverage under its policy was available to plaintiff under La.R.S. 22:1406;
2) the excessiveness of the jury award of general damages;
3) its right to a trial by jury on the issue of statutory penalties and attorney's fees;
4) the award of legal interest to run from date of judicial demand;
5) Commercial Union's primary responsibility for post-judgment legal interest;
6) the award of a $1,500 expert witness fee to Dr. Thomas; and
7) the propriety of the allocation of court costs.
Plaintiff also appealed, contending that the jury's award of $75,000 for past and future loss of earnings and loss of earning capacity was inadequate; that the trial court should have cast Commercial Union to pay legal interest on the entire judgment from the date of entry of judgment until it paid its judgment debt; and that plaintiff is entitled to an increase in attorney's fees for this appeal.
Commercial Union answered both appeals and raises the issue of whether the trial court abused its discretion in its allocation of court costs.
We will now discuss these issues individually.
UNINSURED MOTORIST COVERAGE
Southern American argues that the uninsured motorist coverage in its policy is not available to the plaintiff under the provisions of La.R.S. 22:1406(D)(1)(c).
The pertinent provisions of La.R.S. 22:1406 are as follows:
"D. The following provisions shall govern the issuance of uninsured motorist coverage in this state.
"(1)(a) No automobile liability insurance covering liability arising out of the ownership, maintenance, or use of any motor vehicle shall be delivered or issued for delivery in this state with respect to any motor vehicle registered or principally garaged in this state unless coverage is provided therein or supplemental thereto, in not less than the limits of bodily injury liability provided by the policy, under provisions filed with and approved by the commissioner of insurance, for the protection of persons insured thereunder who are legally entitled to recover damages from owners or operators of uninsured or underinsured motor vehicles because of bodily injury, sickness, or disease, including death, resulting therefrom; provided, however, that the coverage required under this Subsection shall not be applicable where any insured named in the policy shall reject in writing the coverage or selects lower limits. Such coverage need not be provided in or supplemental to a renewal or substitute policy where the named insured has rejected the coverage or selected lower limits in connection with a policy previously issued to him by the same insurer. Any document signed by the named insured or his legal representative which initially rejects such coverage or selects lower limits shall be conclusively presumed to become a part of the policy or contract when issued and delivered, irrespective of whether physically attached thereto.
"(b) Any insurer delivering or issuing an automobile liability insurance policy referred to herein shall also permit the insured, at his written request, to increase the coverage applicable to uninsured motor vehicles provided for herein to any amount.
"(c) If the insured has any limits of uninsured motorist coverage in a policy of automobile liability insurance, in accordance with the terms of Subsection D(1), then such limits of liability shall not *980 be increased because of multiple motor vehicles covered under said policy of insurance and such limits of uninsured motorist coverage shall not be increased when the insured has insurance available to him under more than one uninsured motorist coverage provision or policy; provided, however, that with respect to other insurance available, the policy of insurance or endorsement shall provide the following:
"With respect to bodily injury to an injured party while occupying an automobile not owned by said injured party, the following priorities of recovery under uninsured motorist coverage shall apply:
"(i) The uninsured motorist coverage on the vehicle in which the injured party was an occupant is primary;
"(ii) Should that primary uninsured motorist coverage be exhausted due to the extent of damages, then the injured occupant may recover as excess from other uninsured motorist coverage available to him. In no instance shall more than one coverage from more than one uninsured motorist policy be available as excess over and above the primary coverage available to the injured occupant."
Ronald Dobson was operating a pickup leased by Dobson Pulpwood Company, Inc. at the time of the accident. The company had obtained $100,000 of uninsured motorist coverage with Aetna upon the vehicle. The company additionally insured the vehicle with a one million dollar umbrella liability policy with Southern American. Such coverage provided an additional one million dollars uninsured motorist coverage upon the vehicle. Southern American Ins. Co. v. Dobson, 441 So.2d 1185 (La. 1983). The Supreme Court in that case found that the plain language of La.R.S. 22:1406(D)(1)(a) required that Southern American provide uninsured motorist coverage under the umbrella liability policy in not less than the limits of bodily injury liability provided by the policy. The Supreme Court concluded that:
"The effect of today's decision will be to require insurance companies doing business in this state to offer uninsured motorist coverage to an insured under the provisions of umbrella and excess policies when those policies cover `liability arising out of the ownership, maintenance, or use of any motor vehicle.' The procedure will thus become the same as that for primary policies providing such coverage. If the insured, after having been informed of the (presumably higher) cost, declines such coverage, then the insurance company should have the insured execute a written waiver. Thus insureds in Louisiana will henceforth be in a position to make informed choices, and the costs can be allocated accordingly."
Under both insurance policies Ronald Dobson, as operator of the vehicle, was an "insured."
Southern American argues that by allowing Ronald Dobson uninsured motorist coverage under both Aetna's and its policies the trial court violated the "anti-stacking" provisions of La.R.S. 22:1406(D)(1)(c). We find no merit to this argument.
This case does not present a "stacking" issue. The Supreme Court in Dobson, supra, found that an insured may obtain an umbrella uninsured motorist policy upon a vehicle under the provisions of La.R.S. 22:1406(D)(1)(a), in excess of his primary uninsured motorist policy.
In the present case the insured, Ronald Dobson, is merely seeking to enforce coverage under Southern American's umbrella policy. Southern American's umbrella policy provided to the insured one million dollars in uninsured motorist coverage upon the vehicle in excess of the $100,000 coverage provided by the Aetna policy. The purpose of such an umbrella policy is to provide the insured with both high liability limits and high uninsured motorist benefits upon the vehicle. Such an umbrella policy is intended to provide the insured with additional uninsured motorist benefits once the underlying primary policy limits are exhausted.
This is not a case of the insured attempting to enforce uninsured motorist coverage *981 on a policy of insurance covering a different vehicle. See Courville v. State Farm Mutual Automobile Insurance Co., 393 So.2d 703 (La.1981) and Taylor v. Tanner, 442 So.2d 435 (La.1983). This case deals with two policies of insurance on the same vehicle, with Southern American's policy specifically providing excess coverage once the underlying coverage has been exhausted.
Both policies are considered primary coverage under the statute, since both provide coverage on the vehicle in which the injured party was an occupant. See Capone v. King, 467 So.2d 574 (La. App. 5th Cir.1985), writs denied, 468 So.2d 1203 and 1205 (La.1985). The section on which appellant relies, 1406(D)(1)(c)(ii), merely states that once primary coverage is exhausted, the injured party may then reach one other non-primary policy. Because the Aetna and Southern American policies are both primary, they are available to the plaintiff without reference to the above rule on stacking. See Capone, supra.
As a final comment, if we were to accept Southern American's argument, we would in effect be saying that under no circumstances could an insured enforce coverage under the provisions of an umbrella uninsured motorist policy, due to the provisions of La.R.S. 22:1406(D)(1)(c). Such an interpretation of the statute would lead to an absurd consequence, since La.R.S. 22:1406(D)(1)(a) requires insurance companies doing business in this state to offer uninsured motorist coverage to an insured under the provisions of umbrella and excess policies, under the ruling of Southern American Ins. Co. v. Dobson, 441 So.2d 1185 (La.1983).

EXCESSIVE OR INADEQUATE AWARD
The jury itemized damages, and awarded 1) $250,000 for past physical pain and suffering and past mental anguish; 2) $50,000 for future physical pain and suffering and future mental anguish; 3) $40,000 for permanent disfigurement; and 4) $125,000 for general disability and limitation of normal activities, for a general damage total of $465,000. In addition, the jury gave (5) $60,724.05 for past medical expenses; and (6) $20,000 for future medical expenses; and (7) $75,000 for past and future loss of earnings and loss of earning capacity.
Southern American argues that the jury's award of general damages totaling $465,000 was excessive. The plaintiff argues the inadequacy of the award of $75,000 for past and future loss of earnings and loss of earning capacity. We find no merit to either argument and affirm the jury award.
In Reck v. Stevens, 373 So.2d 498 (La.1979) the Supreme Court said:
"Thus, the initial inquiry must always be directed at whether the trier court's award for the particular injuries and their effects upon this particular injured person is, a clear abuse of the trier of fact's "much discretion," La.Civ.C. art. 1934(3) in the award of damages. It is only after articulated analysis of the facts discloses an abuse of discretion, that the award may on appellate review, for articulated reason, be considered either excessive, Carollo v. Wilson, 353 So.2d 249 (La.1977); Schexnayder v. Carpenter, 346 So.2d 196 (La.1977), or insufficient, Olds v. Ashley, 250 La. 935, 200 So.2d 1 (1967)." (footnote omitted)
As a result of the collision plaintiff suffered severe injuries to his left leg and left foot. He was taken to Schumpert Medical Center in Shreveport and initially treated by Dr. A.E. Dean, an orthopedic surgeon. That doctor diagnosed the injury to the left leg as an open fracture involving the left tibia. The laceration extended approximately from the knee to the ankle. X rays revealed some subluxation of the subtalar joint as well as a dislocation of the talonavicular joint and the calcaneal cuboid joint. A section of bone of the left tibia was missing. Surgery was performed in which an external fixation device was attached. The wound was left open in order to diminish the possibilities of infection. During his first week of hospitalization plaintiff's wound had to be cleaned and a painful *982 debridement procedure performed on three occasions.
On April 19, 1978, Dr. John Valulius performed an operation described as a "cross-leg flap." This operation lasted several hours and consisted of cutting a flap from three sides of the calf of the right leg and then sewing this flap to the injured left leg. The doctor also performed a skin graft involving the removal of skin from plaintiff's thigh and grafting this skin on the right calf. To do this procedure, holes were drilled through the tibia of the right leg and this leg was bracketed in a cross-leg fashion above the left leg. On May 4 the cross-leg flap was separated.
On May 16 another skin graft from the right thigh to the left leg was performed by Dr. Valulius. During this surgery a pin was also inserted in plaintiff's elbow of his left arm due to a fracture which had occurred during the accident. Plaintiff was released from the hospital on May 22, 1978.
Because of an infection plaintiff was again hospitalized in August. His physicians at this point recommended that he consider amputation. His diagnosis was chronic infection or osteomyelitis involving the left tibia and fibula at the site of the fracture. After discharge plaintiff consulted Dr. Donald Overdyke of Shreveport who also recommended amputation.
In November 1978 plaintiff consulted Dr. Alexander Brodsky in Houston, Texas, for another opinion about the amputation. Dr. Brodsky saved the leg. On November 17, 1978, he performed surgery which involved the removal of a portion of bone from the hip and grafting the bone to the non-union site of the left leg. Plaintiff was hospitalized for approximately three weeks following this surgery. On July 18, 1979, plaintiff underwent a fibular transfer whereby the fibula was cut loose from its attachments and moved next to the tibia where it was attached to the tibia with screws. The plaintiff was hospitalized for approximately two weeks following this surgery.
Plaintiff's leg required a cast much of the time during the year following the accident. He had to be hospitalized several times during this time to change the cast.
In October 1979 Dr. Brodsky prescribed the use of an electric bone stimulator to assist in the bone growth. In March 1980 plaintiff was instructed to begin partial weight bearing on his left leg. He was later equipped with a leg brace. In April 1981 he was advised to begin to try to ambulate without the brace. In May of that year he fell due to his weakened condition and suffered a fracture of the left hip. Surgery was performed and he was hospitalized for about nine days for this.
Plaintiff underwent plastic surgery on June 21, 1981. At this time Dr. Brodsky removed the screw from plaintiff's elbow. The plastic surgery required the partial removal of the leg flap to cover an indentation in plaintiff's leg, a result of a loss in muscle structure.
As a result of these serious injuries, his left leg is severely deformed. He must wear a built up shoe. He suffers from loss of muscle structure in his left leg and has a stiffened knee joint. Plaintiff suffers from an increased risk of falling and reinjuring his leg and hip. Dr. Brodsky evaluated him as having a 50-60% medical disability, while Dr. Joseph A. Thomas found the plaintiff suffering from a 70% disability to the body as a whole.
The plaintiff must also undergo future surgical operations. The thirteen screws in plaintiff's left leg must be removed as well as the screws and plate in his hip. Dr. Brodsky opined that plaintiff's left ankle would become arthritic and require future surgical procedures (a fusion), and also feared that the problems in the left foot and kneecap may require future operations.
Numerous witnesses testified as to the physical pain and mental anguish which plaintiff endured during this time. The record also established that plaintiff was engaged in numerous outdoor activities and sports prior to the accident and has been limited in participating in such activities following the accident. Even considering Southern American's argument that the *983 jury may have been unduly influenced by the repetitious exhibition of an array of photographs showing the various surgical procedures performed, under the circumstances of this case the trier of fact did not abuse its discretion in its award.
The jury award of $75,000 for loss of earning capacity and past and future loss of earnings, seems low. At the time of the accident plaintiff was employed by his family in a family owned business. After the accident plaintiff was maintained on the payroll and even had increases in his salary. Although he was no longer able to perform the physical duties of his job, he continued to perform the managerial duties. The record does not reveal that plaintiff has or will suffer any loss in future earnings due to the unique nature of his relationship with the business, but the evidence is clear that plaintiff has suffered a loss in his earning capacity due to his resulting physical disabilities. This loss is in itself compensable. Folse v. Fakouri, 371 So.2d 1120 (La.1979). Although this award would in most cases of similar injuries be manifestly low, on these peculiar facts we are constrained to find no abuse of discretion, finding no satisfying articulable reason for holding the award insufficient.
SOUTHERN AMERICAN'S RIGHT TO A JURY TRIAL
Southern American argues that the trial court erred when it denied defendant the right to a trial by jury on the issue of statutory penalties and attorney's fees. We agree.
On December 15, 1978, plaintiff filed a motion for trial by jury on the issues of negligence and damages only. The motion requested that all other issues be decided by the trial judge. In response to that motion the trial court ordered that the issues of negligence and damages would be tried by a jury and that all other issues in the case would be tried by a judge.
On April 30, 1980, a co-defendant, Northeastern, filed its answer to plaintiff's original petition and a third party demand against Randy Walker and Commercial Union. In the prayer of this answer Northeastern prayed for a trial by jury. The trial court thereupon ordered on April 30, 1980, that "a trial by jury be held as to all issues involved in the lawsuit, upon the posting of bond by the defendant in the amount of $1500." The jury cost bond was posted on May 5, 1980. Thus, at this point, the status of the case was that there was to be a jury trial as to all issues.
On March 1, 1984, plaintiff filed his third amending petition which sought penalties and attorney's fees against Southern American. The attorneys for Northeastern subsequently withdrew from the case. Northeastern, however, was not dismissed from the proceedings. Since the trial court never recalled its order granting a trial by jury as to all issues, that order remained in effect. At trial, counsel for Southern American requested specifically that the issue of penalties and attorney's fees be tried by the jury. That request was denied by the trial judge. Southern American's counsel objected to the ruling.
The right of a litigant to a jury trial is fundamental in character and the courts will indulge every presumption against a waiver, loss or forfeiture. Brewer v. Loewer, 383 So.2d 1325 (La.App. 3rd Cir.1980), writ denied, 391 So.2d 456 (La. 1980). Where one co-defendant files its own demand for a jury trial, such demand protects the right of all parties to a jury trial. City Stores Co. v. Johns-Manville Sales, 395 So.2d 953 (La.App. 4th Cir.1981). In the present case Northeastern demanded and was granted an order for a jury trial as to all issues. Such demand protected Southern American's right to a jury trial as to all issues including the issues of penalties and attorney's fees. Southern American was deprived of its right to a jury trial concerning these issues. The only way that we can now accord Southern American its rights is to remand the case to the trial court, so that a jury can be drawn and selected to hear and decide the *984 issues relating to penalties and attorney's fees.
At oral argument before this court on this appeal, Southern American's counsel suggested that this court simply decide these issues, since the record and the evidence is before us. We could view counsel's suggestion as a waiver of defendant's present right to a jury trial, but if we were to take this case on the record and decide these issues, we would not be accommodating plaintiff, because plaintiff has what he believes to be and argues is a valid judgment for penalties and attorney's fees, reviewable by this court, to be sure, but under the constraints of manifest error and abuse of discretion. In fact, plaintiff's counsel is asking not only for an affirmation, but also for an increase in the award of attorney's fees. Moreover, since our ruling today necessarily finds that the trial court's separate adjudication of the penalty and attorney's fees issues was a nullity, plaintiff now has the same right to a jury trial as defendant, and he has not waived it. So the only thing that we can do is remand these issues for a new trial before a jury.
LEGAL INTEREST FROM DATE OF JUDICIAL DEMAND
Although recognizing the rule as expressed in LSA-R.S. 13:4203 and Darbonne v. Safeco Insurance Company of America, 452 So.2d 801 (La.App. 3rd Cir. 1984), that legal interest accrues on a judgment against the UM carrier from date of judicial demand, rather than from date of judgment, Southern American asks us to make an exception in the present case, for what it perceives to be purely equitable reasons, because it was not until January 1984 that the Louisiana Supreme Court declared that Southern had UM coverage.
To carve out such an exception to the rule, even if we had the authority to do so, would be tantamount to saying that any time an insurance company defendant raises coverage as an issue in the case, interest runs from judgment rather than from date of judicial demand. We fail to see the equity in such a ruling. Moreover, R.S. 13:4203 is quite clear:
"Legal interest shall attach from date of judicial demand, on all judgments, sounding in damages, `ex delicto', which may be rendered by any of the courts."
COMMERCIAL UNION'S RESPONSIBILITY TO PAY LEGAL INTEREST
Southern American and Ronald Dobson on appeal argue that the trial court erred in failing to cast Commercial Union with interest on the entire judgment from the date of entry of the judgment through the date when it paid its policy limits.
Commercial Union provided Randy Walker with liability insurance coverage. The policy further provided for certain supplementary payments including
"... all interest on the entire amount of any judgment therein which accrues after entry of judgment and before the company has paid or tendered or deposited in court that part of the judgment which does not exceed the limit of the company's liability thereon."
The liability policy limits were $5,000. On July 18, 1984, judgment was signed against Randy Walker for $620,724.05 and against Commercial Union for $5,000. The record indicates that Commercial Union paid the $5,000, together with interest on the policy limits from date of judicial demand, into the registry of court on January 28, 1985.
The law is clear that under such a supplementary payments provision the insurer is liable for interest upon the entire amount of the judgment until such policy limits, and interest on the policy limits from date of judicial demand, are paid or tendered by it. Doty v. Central Mutual Insurance Company, 186 So.2d 328 (La.App. 3rd Cir. 1966), writ denied, 187 So.2d 451 (La.1966).
Commercial Union argues that the provision should not be applicable where Commercial Union has not appealed. We disagree. In McCrossen v. Bieszczard, 234 So.2d 763 (La.App. 4th Cir.1969) the insurer was held liable for interest on the entire judgment from date of judgment until payment *985 or tender where it neither appealed nor answered the appeal. Where the insurer fails to appeal, we can see no excuse or reason why the insurer should not pay or tender its policy limits to avoid the supplementary payments provision. Where an insurer unilaterally decides not to pay or tender its policy limits, the provision is clear that the insurer is responsible for the accruing interest on the entire judgment from entry of judgment until payment or tender.
In the present case we find Commercial Union liable for legal interest on the entire unpaid amount of the judgment ($515,724.05this sum representing the total amount of the judgment of $620,724.05, less a credit for the $100,000 paid by Aetna and less a credit for the $5,000 liability coverage owed by Commercial Union) from the date of the entry of the judgment, July 18, 1984, through January 28, 1985. For this period Southern American is relieved of its liability for legal interest.
EXPERT WITNESS FEE
Southern American also argues that the trial court's award of a $1500 expert witness fee to Dr. Joseph A. Thomas was excessive. We agree.
Expert witnesses are entitled only to reasonable compensation for their appearance in court and for preparatory work done. Town of Krotz Springs v. Weinstein, 401 So.2d 664 (La.App. 3rd Cir. 1981), and La.R.S. 13:3666. The amount of an award for an expert's fee is within the discretion of the trial court and will not be disturbed absent an abuse of that discretion. Oshinski v. Central National Ins. Co. of Omaha, 432 So.2d 929 (La.App. 4th Cir.1983), writ denied, 440 So.2d 148 (La. 1983).
In the present case Dr. Thomas testified in open court. The testimony was not lengthy. Dr. Thomas resided in the same town where the trial occurred. We find the trial court abused its discretion in awarding Dr. Thomas a $1500 expert fee. Apparently, the basis for this award was simply that it was what the doctor charged. Appellant does not complain of the fees awarded the remaining medical witnesses. Those awards varied, the highest being $700. We reduce Dr. Thomas' expert fee to $700.
COURT COSTS
Consolidated with this appeal is another (assigned our number 85-498), arising out of the same case but taken from a separate judgment relating to court costs. We will discuss that appeal herein, but a separate judgment will this date be rendered in Dobson v. Aetna Casualty and Surety Company, 484 So.2d 986 (La.App. 3rd Cir. 1986).
Southern American argues that the trial court erred in its assessment of court costs. The trial court assessed two-thirds of the court costs against Southern American and one-third against Commercial Union. Southern American argues that Commercial Union should have been cast with payment of all court costs. Commercial Union answered the appeal alleging Southern American should have been assessed all of the court costs.
The trial court is vested with great discretion in apportioning costs as it deems equitable. American Deposit Ins. Co. v. Walker, 450 So.2d 33 (La.App. 3rd Cir.1984). In the present case we find no abuse of that discretion.
ATTORNEY'S FEES FOR APPEAL
Finally, plaintiff has appealed seeking an increase in the award of attorney's fees. Since we shall remand the case for a new trial on that issue, the entire subject of attorney's fees will be a question for the jury to decide.
For these reasons, we reverse and set aside that part of the judgment granting Ronald Dobson a 12% penalty in the sum of $61,886.88 and attorney's fees in the sum of $85,000, and in the case, insofar as it involves a determination of whether penalties and attorney's fees are due, and if so, the amount due, is remanded to the trial court for a new trial by jury. The judgment *986 is hereby amended to cast Commercial Union Insurance Company for the payment of legal interest on the sum of $515,724.05 from the date of entry of the judgment through January 28, 1985. The judgment awarding Dr. Thomas the expert witness fee of $1500 is hereby amended to reduce that fee to $700. In all other respects the judgment is affirmed. The costs of this appeal are assessed against Southern American Insurance Company.
AMENDED; AFFIRMED IN PART; REVERSED IN PART; AND REMANDED.