626 So.2d 1191 (1993)
Vera BUCKBEE, et al., Plaintiffs-Appellants,
v.
AWECO, INC., et al., Defendant-Appellee.
No. 87-1201.
Court of Appeal of Louisiana, Third Circuit.
June 2, 1993.
Order Granting Limited Rehearing September 29, 1993.
*1192 William B. Baggett, Drew Averill Ranier, Lake Charles, for Vera Buckbee Ind. etc.
Robert W. Clements, Lake Charles, for Aweco, Inc. et al.
James Clarence Lopez, Opelousas, for Liga and Rockwood Ins. Co., In Liquidation.
Before DOUCET, KNOLL and COOKS, JJ.
KNOLL, Judge.
The Louisiana Supreme Court remanded this case to us to determine damages for the wrongful death of William Buckbee.[1] The plaintiffs, Vera Buckbee, widow of William Buckbee, and his minor son, Larry Buckbee, *1193 seek damages for Buckbee's pain and suffering prior to his death, as well as damages for loss of economic support, loss of love and affection, and mental anguish.

FACTS
The facts of this case are clearly set forth in the two Louisiana Supreme Court's decisions, and our three appellate reviews published at: 614 So.2d 1233 (La.1993); 561 So.2d 76 (La.1990); 587 So.2d 79 (La.App. 3rd Cir.1991); 542 So.2d 81 (La.App. 3rd Cir.1989); and, 418 So.2d 698 (La.App. 3rd Cir.1982), writ denied, 422 So.2d 166 (La. 1982). Accordingly, we will not reiterate the facts herein, except where appropriate in our treatment of the issues presented.

PRELIMINARY MATTERS
In its appellate brief, United Gas raises a number of issues which are generally applicable to the awards we are asked to make.
United Gas raises a question of whether we can award the Buckbees an amount of damages in excess of that prayed for in their original petition. In their original petition, the Buckbees sought $3,001,500 in damages. In their most recent appellate brief, the Buckbees seek an award of $6,000,000.
Citing Freeman v. Harold Dickey Transport, Inc., 467 So.2d 194 (La.App. 3rd Cir. 1985) and Smith v. Moncrief, 421 So.2d 1127 (La.App. 3rd Cir.1982), writ denied, 426 So.2d 177 (La.1983), United Gas argues that the Buckbees cannot recover an amount greater than that for which they prayed for in their petition.
Initially, we point out that the Freeman opinion involved a question strictly related to the award of special damages in excess of the amount sought in the petition. Accordingly, we find that the Freeman opinion is not dispositive of the issue. Likewise, we find the Smith opinion also distinguishable. It is clear that the plaintiffs in Smith were seeking a particular sum which was allegedly due them "under certain contractual stipulations set for in acts of sale." Therefore, we find that neither of those opinions require us to restrict our damage award to the sums prayed for in the Buckbees' petitions.
Moreover, we find Wexler v. Martin, 367 So.2d 111 (La.App. 4th Cir.1979), writ denied, 369 So.2d 1352 (La.1979), dispositive of the issue. Justice Lemmon, then sitting on the Fourth Circuit Court of Appeals, stated at pages 113-114:
"In their petition plaintiffs alleged items of general damages, estimating the amount thereof, and at trial they presented evidence to support the demand for relief. The judgment granted the relief in an amount greater than the estimated amount listed in the original petition.
Pertinent to the decision of this issue is C.C.P. art. 862, which provides:
`Except as provided in Article 1703, a final judgment shall grant the relief to which the party in whose favor it is rendered is entitled, even if the party has not demanded such relief in his pleadings and the latter contain no prayer for general and equitable relief.'
At the threshold we observe that there is no requirement in the Code for specific allegations of items of general damage. Logically, if there is no need to itemize or estimate general damages, there should be no penalty or limitation on a party who does so.
The exception in the introductory clause of C.C.P. art. 862 is also significant. Inasmuch as the excepted article (C.C.P. art. 1703) expressly provides that a judgment by default cannot exceed in amount that demanded in the petition, the general article (C.C.P. art. 862) should logically be interpreted to mean that other types of final judgments can exceed in amount that demanded in the petition. Of course, this is particularly persuasive since, as noted above, there is no requirement for itemization or estimation of general damages in the first place.
Furthermore, the source of C.C.P. art. 862 is Federal Rule 54(c), and the federal cases interpreting that rule consistently allow judgments to exceed the amount of the demand." (Citations and footnote omitted.)
*1194 United Gas also asks us to determine the damage award based, at least in part, upon the reported appellate cases of the 1980 era, since that is the period of time that this injury occurred and this case was originally tried. We disagree.
Our brethren of the Fourth Circuit commented on this issue in Wall v. American Emp. Ins. Co., 377 So.2d 369 (La.App. 2nd Cir.1979), affirmed, 386 So.2d 79 (La.1980). In Wall, the court declined to base its award on cases reported at the time of the accident which had occurred over 10 years earlier, and stated at page 375:
"The already difficult attempt to measure in money, damages arising out of injury or death to a person should not be further complicated by a court being required to determine or speculate how and in what amount those damages would have been assessed some time in the past. In the assessment of general damages at this level, we are not obliged to make an award equal to either the highest or the lowest dollar amount we would affirm as in ordinary appeals. Here we enjoy the discretion to make an award which is neither high nor low, but which is just and fair as adequate for the damages as revealed by the record."
Our research has found no appellate case other than Wall which has addressed this issue. Accordingly, we find that we are not required to limit our award to appellate court cases reported in the 1980 era.
United Gas next contends that it was improper for the Buckbees' to refer in brief to an award of pain and suffering computed on a mathematical formula based on "units of time". Although the Third Circuit has never specifically addressed this issue, in Hebert v. Travelers Insurance Company, 245 So.2d 563, 565 (La.App. 3rd Cir.1971), writ denied, 258 La. 903, 248 So.2d 332 (La.1971), we summarized the jurisprudence as follows:
"Under this method, it is determined what the plaintiff's pain and suffering is worth in monetary terms for a given unit of time and then that figure is multiplied by the number of the said units of time contained in the expected duration of the pain and suffering. Thus a final figure is arrived at which supposedly represents a reasonable picture of what the amount of general damages should be. Although our Supreme Court has generally rejected the use of mathematical formulae in the determination of the amounts of damages, Pennington v. Justiss-Mears Oil Co., 242 La. 1, 134 So.2d 53 [1961]; McFarland v. Illinois Central Railroad Co., 241 La. 15, 127 So.2d 183 [1961], the unit-of-time argument was approved by our brothers of the First Circuit in Little v. Hughes, La.App., 136 So.2d 448 [1961]...."
Our review of the Pennington case shows that the Supreme Court disapproved of the trial court's projection of a widow's loss of future income because of the death of her husband based on his present annual salary, discounted to present cash value. A similar method is used today with the caution that these awards are speculative, not subject to exact mathematical calculations, and that much discretion is left to the trier of fact in the determination of the final award. Likewise, in McFarland the Supreme Court disapproved of an appellate court's increase in damages based on a mathematical formula developed from damages awarded in three intermediate appellate court decisions. Accordingly, the McFarland court stated that the use of these prior decisions improperly removed trial court discretion from the choice of the proper award in each, individual case.
In the Little case, the appellate court, reviewing a jury award in a personal injury case, found no error in the plaintiff's presentation of a chart which attempted to place an hourly value on pain and suffering. There the trial court also cautioned the jury that the charts were not evidence and constituted mere argument by the plaintiff's attorney. In the present case, we view the Buckbees' inclusion of a unit comparison of pain and suffering awards in much the same way as our brethren in Little. We are well aware that charts and comparisons made by plaintiffs' counsel are not evidence and are not meant to remove our discretion in making an award.
*1195 Lastly, United Gas suggests that we consider the impact that more than 11 years' legal interest will have on the award we make, and that we use our inherent authority to fashion an award which will equitably take this added amount into consideration.
LSA-C.C.P. Art. 1921 provides that interest shall be awarded in the judgment as prayed for. LSA-R.S. 13:4203 further states that legal interest shall attach from date of judicial demand, on all judgments, sounding in damages, ex delicto, which may be rendered by any of the courts. As such, it is clear that the legislature has concluded that a successful tort victim is entitled to legal interest as a matter of law, and that it attaches from the date of judicial demand.
We addressed similar arguments in Dobson v. Aetna Cas. and Sur. Co., 484 So.2d 976 (La.App. 3rd Cir.1986) and again in LaSalle Pump & Supply v. La. Midland R. Co., 459 So.2d 768 (La.App. 3rd Cir.1984), writ denied, 462 So.2d 1251 (La.1985). In Dobson, we applied LSA-R.S. 13:4203, stating that we saw no need to carve out an exception to the general rule. Earlier, in the LaSalle Pump case approximately six years elapsed between the tort and the resolution of the liability issue in the appellate courts. The reason for the delay was that the appellate court ordered a new trial because plaintiff used incompetent evidence in the trial court. When the case returned to us on appeal after the new trial, we rejected the defendant's argument that legal interest should not be granted retroactive to the filing of the original lawsuit. We stated at page 772:
"Although incompetent evidence was admitted and used in the first trial, this fact does not diminish the fact that the defendant-appellant's negligence is solely responsible for the necessity of this lawsuit."
We find the same reasoning applicable herein. If we were to accept United Gas's argument, we would be effectively denying the Buckbees of their legislatively created right to receive legal interest on their judgment in tort against United Gas.

DAMAGES FOR PAIN AND SUFFERING
Vera, the widow, and Larry Buckbee, the surviving son, seek to recover damages for the pain and suffering William Buckbee endured prior to his death.
In Reck v. Stevens, 373 So.2d 498 (La.1979), the court recognized that the primary purpose of the judge or jury in fixing the award in a personal injury case is to adequately compensate the injured person for his injury under the facts shown to exist in his case. Furthermore, it is well entrenched in Louisiana jurisprudence that in the determination of damages for pain and suffering, a court should focus on the duration and the intensity of the pain. Walker v. St. Paul Ins. Companies, 339 So.2d 441 (La. App. 3rd Cir.1976), on remand, 343 So.2d 251 (La.App. 1st Cir.1977), writ denied, 345 So.2d 61 (La.1977).
In the case sub judice, the plaintiffs established for the record the pain and suffering William Buckbee endured before he died.
Buckbee was 55 years of age at the time of the accident. After the explosion and fire, Buckbee was briefly seen in the emergency room at Lake Charles Memorial Hospital. Because of the severity of his burns, he was transferred to Baton Rouge General Hospital's burn unit. Dr. James D. Smith, a general surgeon specializing in the treatment of burns, treated Buckbee during the 26 days prior to his death.
Dr. Smith testified that Buckbee was conscious when he was admitted to the burn unit and that he remained conscious until just hours before his death. Buckbee told Dr. Smith that at the time of the explosion, his clothes caught fire and that he either jumped or was blown from the scaffolding eight to ten feet to the ground.
Buckbee suffered burns on 75% to 80% of his body. Dr. Smith described Buckbee at the time of his admission to the burn unit:
"From the waist down he was ... essentially burned completely from both front and back circumferentially from hips to toes. Almost all of his back was burned. Most of his chest was burned. All of his *1196 face was burned, as well as an extensive portion of both upper extremities, both arms."
50% to 55% of Buckbee's burns were full thickness burns. As described by Dr. Smith, this means that over 50% of Buckbee's skin was completely gone and that the burn extended down into the fat of his body. Dr. Smith explained that although full thickness burns are not painful initially (for approximately one day), pain returns as soon as the nerves have a chance to regenerate. The remainder of Buckbee's burns were classified as second-degree burns. Dr. Smith testified that second-degree burns are the most painful. He stated:
"[S]econd degree burns are painful because when the top layer of skin has been burned away the nerve endings are exposed and just water dripping across it or air currents brushing across it causes sensation of pain."
Because of the burns, Buckbee was unable to bend his arms and legs.
After assessing Buckbee's condition, Dr. Smith testified that Buckbee had no pulse in the legs because the burns cut off the circulation to the lower extremities. As a result, Dr. Smith immediately lanced both of Buckbee's legs "[c]ompletely through the burn, from good tissue to good tissue," from the groin to the toes to relieve pressure on the arteries and re-establish blood flow. This procedure, an escharotomy, was performed without general anesthetic, but with injections of morphine.
Each day of his hospitalization, Buckbee was taken to the Hubbard tank, a giant whirlpool, to remove dead skin. Dr. Smith described the procedure as follows:
"What we do is submerge [the burn patient]... We add ... Clorox or Betadine, some sort of antiseptic to it, and then take scissors and a rough washcloth and any skin that is loose and looks like it will come off without bleeding or being too painful, we take off.
* * * * * *
It is very painful because the way that you decide when not to take it [skin] off is basically you kind of pull and scrub until they decide that that hurts too much. Probably the best description is one of my patients told me it was like being bathed on a daily basis with sandpaper. Because what we do, is you just take a rough washcloth and scrub back and forth as gently as you can, but also trying to get as much dead tissue off as you can."
Buckbee underwent surgery three times during his hospitalization to remove dead, burned skin and to graft skin onto the burned portions of his body. In the first surgery, Dr. Smith collected unburned skin from Buckbee's body. Once the unburned skin was removed from Buckbee's abdomen, upper chest, and wrists by using a dermatome, an instrument which looks like barber shears, Dr. Smith "excis[ed] or trim[med] away the areas of third degree burns down to good bleeding tissue, and then we put ... the skin grafts ... on the burned areas." Only 60-65% of the first grafts were successful.
Thirteen days later, Buckbee's temperature rose to approximately 104 degrees and he began to show evidence of heart failure. Because these were symptoms of infection, Dr. Smith again surgically removed more dead skin from Buckbee's chest, left arm, and left leg, and grafted cadaver skin to these areas since Buckbee no longer had his own skin available for grafting. Shortly after Buckbee's second surgery, he developed heart, kidney and lung failure caused by bacterial infections growing in his body tissue.
Nine days before Buckbee's death, Dr. Smith again returned Buckbee to surgery for the removal of more dead skin. At this time, Dr. Smith grafted pig skin to get rid of the sources of infection and to temporarily cover Buckbee's exposed tissue.
Despite the medical efforts to rid Buckbee's body of infection, his condition steadily deteriorated after the last surgery and on the 26th day of his hospitalization Buckbee died from septicemia as a result of the burns he suffered.
Before making an award for Buckbee's pain and suffering, United Gas urges us to consider that Buckbee's pain was alleviated *1197 with medication. From carefully studying the nurses' notes, we are well aware that Buckbee was given pain medication during the time of his hospitalization. Dr. Smith's testimony shows that IV narcotics were administered to Buckbee during the first 24 hours, that injectable narcotics were administered prior to his submersion in the Hubbard tank, and that the nursing staff had standing orders to administer oral pain medication every three hours as needed. Despite the pain medication that was administered, the record also shows that William Buckbee suffered greatly. Mrs. Buckbee stated:
"He would tell me that he was [in pain in the hospital]. He wasn't a great one to complain about pain or anything this way, but this had got to the point where it was just about more than he could stand.
* * * * * *
He was telling me about ... [the Hubbard tank], that ... they would take him down each day to this tank, and ... he said that he could almost yell when they put him in there, and I said well, yell. I said everyone else does that goes in there. I said why should you grit your teeth and not holler. I said if it makes you feel any better at all go ahead and holler, and so that's just what he would do. So that's whywe would wait maybe every morning until we knew that they had had their baths or whatever you want to call them, and then we would go over because even out in the waiting room you could hear the people hollering in pain when they were put in this tank."
In a similar vein, the hospital records document Buckbee's pain and suffering. A few examples of the nurses' notes taken from a cross section of the period of hospitalization highlight Buckbee's pain: January 16: "Complains of pain to back and hips, still admits to upper abdominal pain; face swollen, more so on left side, left eye swollen shut"; January 29: "Bed bath given with poor toleration, screaming and yelling out in pain, very upset and moaning"; February 2: "Repositioned to left side, complains of much pain; moaning"; February 3: "Complains of severe pain".
The nurses' notes are replete with the conscious and excruciating ordeal Buckbee suffered before he died. Reading the nurses notes is like reading a description of a torture.
There is no injury reported in Louisiana jurisprudence of the magnitude this massive burn victim consciously suffered for 26 days before he died. Buckbee fell into unconsciousness just several hours before he died. Until then, he struggled and suffered to live only to die in the end. We are impressed not only with his physical pain and suffering, but also his mental anguish he endured since he was alert.
We are mindful that putting a monetary award on pain and suffering is very difficult. See Fowler v. Western U. Tel. Co., 357 So.2d 1305 (La.App. 3rd Cir.1978), writ denied, 359 So.2d 196 (La.1978), for an excellent discussion concerning this task. We recognize that burn victims suffer an exceptional amount of pain, not only from the injury itself, but also from the medical treatment necessitated. The record before us, which we have thoroughly reviewed, firmly shows the agonized sufferings Buckbee endured his last 26 days. Therefore, considering the extent of Buckbee's burns, and the painful medical treatment he consciously endured, we find the award of $2,000,000 for his physical and mental pain and suffering just and proper. Any award less than this would not recognize the extent of Buckbee's sufferings in the pain and suffering aspect of this case.

WRONGFUL DEATH DAMAGES
Vera and Larry Buckbee seek wrongful death damages for the death of William Buckbee.
The elements of damage for wrongful death are loss of love and affection, loss of services, loss of support, medical expenses, and funeral expenses. Pierre v. Lallie Kemp Charity Hosp., 515 So.2d 614 (La.App. 1st Cir.1987), writ denied, 515 So.2d 1111 (La. 1987). In addition, the jurisprudence recognizes that the survivors of the decedent may also be awarded damages for their mental pain, suffering, and distress resulting from the death. Duvernay v. State, Department *1198 of Public Safety, Division of State Police, 433 So.2d 254 (La.App. 1st Cir.1983), writ denied, 440 So.2d 150 (La.1983).
The awards for damages in a wrongful death action may differ among the plaintiffs on the basis of differing degrees of affection which existed between the deceased and the different plaintiffs, or differing degrees of guidance needed by minor plaintiffs. Mergen v. Piper Aircraft Corp., 524 So.2d 1348 (La.App. 1st Cir.1988), writs denied, 532 So.2d 154, 155, 156 (La.1988). It is likewise well established that in awarding damages for loss of society and companionship, Louisiana courts take into consideration the closeness of the family relationship. Mathieu v. State, DOTD, 598 So.2d 676 (La.App. 3rd Cir.1992), writ denied, 600 So.2d 665 (La. 1992).
Plaintiffs, referring to dicta in Bergeron v. Blake Drilling & Workover, 599 So.2d 827 (La.App. 1st Cir.1992), writs denied, 605 So.2d 1117, 1119 (La.1992), argue that we should award a separate amount of damages for the pain and suffering Vera and Larry suffered because of witnessing Buckbee's lingering death. They argue that Vera attended to Buckbee daily at the hospital from the time of the accident until his death, and that Larry, knowing the serious condition of his father, testified that the 26 days of his father's hospitalization were the longest days of his life. After carefully reviewing plaintiffs' argument, we find that the applicable law and jurisprudence do not allow us to make a separate award. Rather, we find this element of damages for grief subsumed in the larger award for their loss of society and loss of services. See, Cupstid v. Harrison Hardwood Mfg. Co., 552 So.2d 1223 (La.App. 3rd Cir.1989), writ denied, 558 So.2d 572 (La.1990).
In the case sub judice, it is unrefuted that William and Vera Buckbee had a close and loving relationship throughout their 12 years of marriage. After their marriage, William Buckbee adopted Larry, Vera's son from a prior marriage. At the time of the adoption, Larry was four and one-half years of age. Vera testified that her husband treated Larry as his own son and that they had a normal father-son relationship.
Vera testified that Buckbee typically participated in family outings. She further stated that her husband took a great deal of interest in Larry and spent quite a bit of time together. Larry testified that he and his dad fished together and did a lot of things that a father and son usually do. The record further shows that Buckbee was devoted to his family and took care of their needs.
In late 1979 LCR hired William Buckbee. At that time he moved from their home in Hutchinson, Kansas to Lake Charles. Vera and Larry remained in Kansas and were planning to rejoin Buckbee at the end of the school year. Vera stated that she was notified at work that Buckbee was injured on the job, and that LCR flew her to the burn unit in Baton Rouge on the day of the accident. The record shows that Vera stayed with her husband at the burn unit, helping to feed him because he could not bend his arms, and to console him when he complained of the pain he was suffering. The record shows that she and Dr. Smith discussed Buckbee's decline and that she made the decision not to take extraordinary measures to keep him alive. With Buckbee's death, Vera testified that she lost a friend, a confidant, and her helpmate.
Larry Buckbee testified that he had no contact with his natural father and that he was old enough to remember being adopted by Buckbee. He testified that Buckbee was the only contact he had with a male parent. He stated that he felt very close to Buckbee, that they often did things together when Buckbee was not working, and that Buckbee took an interest in his school work. He characterized his father in the following words, "I believe he was a very understanding father ... He was very gentle and kind, and when I got out of line he ... stepped in and corrected me when it was needed." He further testified that his father acted as a confidant and advisor to him, and that no one has replaced Buckbee since his death.
After the death of his father, Larry testified that he became depressed to the extent that it adversely affected his performance in school; as a result, he withdrew from school after his junior year of high school. Larry *1199 also testified that since the death of his father, his mother gets depressed quite often and seems to be different than she was prior to his father's death.
Considering the facts of this case, we find that Vera Buckbee is entitled to an award of $400,000, and Larry Buckbee is entitled to an award of $300,000 for the wrongful death of William Buckbee.

SPECIAL DAMAGES: LOSS OF ECONOMIC SUPPORT, FUNERAL AND MEDICAL EXPENSES
In addition to the general damages treated above, Vera and Larry Buckbee seek special damages for loss of economic support, as well as William Buckbee's funeral and medical expenses.
The Buckbees' funeral and medical expenses in the amount of $54,194.62 were stipulated to at trial. Accordingly, they are entitled to judgment for these sums.
In addition, we find that Vera and Larry Buckbee are entitled to receive compensation for loss of economic support.
The jurisprudence relative to the decedent's loss of wages, past and future, is well established and will not be repeated herein. See, Pitts v. Bailes, 551 So.2d 1363 (La.App. 3rd Cir.1989), writs denied, 553 So.2d 860 (La.1989), and 556 So.2d 1262 (La.1990).
Donald Cornwell was the only economist to testify concerning William Buckbee's loss of wages. At the time of the accident, Buckbee earned $1,925 per month. Cornwell testified that Buckbee had an 8.87 year work-life expectancy at the time of the accident. After applying a discount figure to decrease the award to account for the Buckbees' ability to earn interest by investing the funds, and deducting 23.12% for the amount of wages Buckbee would have personally used in the future had he survived, Cornwell projected that the loss of wages, past and future, amounted to $218,276.37.
The only opposition posed by United Gas to Cornwell's projection is its contention that he failed to discount the loss of wages between Buckbee's date of death and the time of trial, a period of 7.15 years. We disagree. Cornwell's testimony reflects that he did not discount this figure because by the time of trial, Vera and Larry Buckbee had been effectively denied the chance to invest these sums and draw interest.
Accordingly, after carefully considering the evidence for loss of economic support, we find that $218,276.37 is a fair award for the loss of income, past and future.

EFFECT OF BUCKBEES' SETTLEMENT WITH WATT
In its latest decision, the Louisiana Supreme Court concluded that the Jerry R. Watt Company was a co-tortfeasor with United Gas and a defendant in a third-party action brought by United Gas. Accordingly, since the Buckbees settled with Watt prior to trial, the Louisiana Supreme Court stated that "United is entitled to a reduction of one-half of the damages fixed by the court of appeal." Accordingly, the damages detailed in our judgment herein reflect the reduction ordered.

DECREE
For the foregoing reasons, IT IS ORDERED, ADJUDGED, AND DECREED that there be judgment herein in favor of VERA BUCKBEE and LARRY BUCKBEE and against UNITED GAS PIPE LINE COMPANY in the full and true sum of $1,136,235.49 together with legal interest from the date of judicial demand, until paid.
IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that there be judgment in favor of VERA BUCKBEE and against UNITED GAS PIPE LINE COMPANY in the full sum of $200,000, together with legal interest, until paid.
IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that there be judgment in favor of LARRY BUCKBEE and against UNITED GAS PIPE LINE COMPANY in the full sum of $150,000, together with legal interest, until paid.
All costs of trial and this appeal are assessed to United Gas Pipe Line Company.

*1200 ON REHEARING
PER CURIAM.
Defendant, United Gas, filed an application for rehearing requesting, inter alia, that we address how interest should be computed upon the judgment. We hereby grant the application for rehearing with this per curiam for the limited purpose of addressing the interest issue. In all other respects the rehearing is denied.
The issue is whether interest on the judgment should accrue at 7%, the interest rate provided by LSA-C.C. Art. 2924 on January 15, 1980, the date of the accident, or whether fluctuating interest rates in effect at the time the lawsuit was filed should apply.
On rehearing United Gas argues that legal interest is fixed on the date of the accident because "the legal, substantive rights of the parties to this lawsuit arose on the date of the accident, that is, January 15, 1980." This is before the effective date for the applicability of fluctuating interest rates, September 1, 1980. United Gas contends that the statute cannot be applied retroactively as this would "constitute an unconstitutional interference with the established rights of the parties." We do not find any merit to United Gas's argument.
LSA-C.C. Art. 9 provides:
"When a law is clear and unambiguous and its application does not lead to absurd consequences, the law shall be applied as written and no further interpretation may be made in search of the intent of the legislature."
It is undisputed that the Buckbees filed their lawsuit after the effective date for the applicability of fluctuating interest rates.
LSA-R.S. 13:4203 provides:
"Legal interest shall attach from date of judicial demand, on all judgments, sounding in damages, `ex delicto', which may be rendered by any of the courts." (Emphasis added.)
This court had the opportunity to address an issue concerning the correct rate of interest in Matthias v. Brown, 599 So.2d 495 (La.App. 3rd Cir.1992), writ denied, 604 So.2d 1005 (La.1992). In Matthias, the defendants were arguing that fluctuating interest rates were applicable; the plaintiff argued that 12% was the correct rate since it was the judicial interest rate applicable at the time suit was filed. Plaintiff further argued that application of fluctuating interest rates would violate the general rule against retroactive application of substantive laws. LSA-C.C. Art. 6. We disagreed with plaintiff's argument and reversed the trial court and held that Article 2924(B)(2) was controlling which states: "(2) The rate of judicial interest resulting from a lawsuit pending or filed during the indicated periods shall be as follows:" (Emphasis added.)
We find the law is clear that fluctuating interest rates are applicable to the case sub judice and further, that the Matthias case is dispositive of this issue.
Accordingly, the interest on the judgment shall be subject to fluctuating rates of judicial interest for all periods the Buckbees' suit was pending, from date of judicial demand until paid.
NOTES
[1] This case has been before us three times, involving different issues other than the one before us today. Even though this litigation commenced on January 12, 1981, this is the first time that quantum has been set as it relates to William Buckbee and his heirs.