697 So.2d 1373 (1997)
Ronald S. RUIZ
v.
Frank J. ONIATE, Jr.
Frank J. ONIATE, Jr.
v.
Lanzin MAGEE and Boh Bros. Construction Company, Inc.
Frank J. ONIATE, Jr.
v.
ST. JUDE MEDICAL CENTER, INC.
Frank J. ONIATE, Jr.
v.
MAHORNER CLINIC, et al.
Nos. 96-CA-2211 to 96-CA-2214.
Court of Appeal of Louisiana, Fourth Circuit.
August 6, 1997.
Rehearing Denied August 29, 1997.
*1376 Richard P. Ieyoub, Attorney General, Miles G. Trapolin, Special Assistant Attorney General, Trapolin Law Firm, New Orleans, for Appellants State of La. and Charity Hospital of Louisiana.
Robert A. Caplan, Lewis & Caplan, New Orleans, and Evan F. Trestman, a Professional Law Corporation, New Orleans, and Vincent J. Glorioso, Jr., New Orleans, for Appellee Frank J. Oniate, Jr.
Before BYRNES, WALTZER and MURRAY, JJ.
BYRNES, Judge.
Plaintiff, Frank J. Oniate, Jr., filed his original suit on August 4, 1983 against Lanzio Magee and his employer, Boh Brothers, to recover for neck injuries sustained in a motor vehicle accident. In December 1987, Oniate began to exhibit symptoms of osteomyelitis (septic hip) which resulted from a flair-up of a latent surgical staph infection apparently contracted in November of 1987. By the time it was diagnosed, Oniate's hip was destroyed. Oniate sued his physicians and hospitals for malpractice for the failure to diagnose. All defendants, except Charity Hospital of Louisiana at New Orleans and the State of Louisiana through the Department of Health and Human Resources (hereinafter referred to collectively as "Charity") settled prior to trial. The trial court held that Charity's failure (through its physicians) to diagnose Oniate's osteomyelitis on January 12, 1988 was the sole cause of Oniate's hip injury and awarded Oniate $7,206,319.00. Charity appeals. Oniate did not answer the appeal.
Charity's appeal is based on arguments that it should not have been held 100% liable, i.e., Charity asserts issues of comparative fault; that the damage award was excessive; and that Charity is entitled to the benefit of the $500,000.00 cap for malpractice, exclusive of past and future medical expenses.

I. CHARITY'S VICARIOUS LIABILITY IS LIMITED TO THE EXTENT OF THE LIABILITY OF ITS PROFESSIONAL HEALTH CARE PROVIDERS.
The trial court in its reasons for judgment stated:
Charity is not protected by the statutory cap set out in R.S. 40:1299.39(F). The amendment to cover [the] State and its agencies (R.S. 40:1299(A)(1)(a) did not take effect until September 9, 1988). Said act has been held to be non-retroactive. See Sibley Vs. Board of Supervisors of L.S.U., 477 So.2d 1094 (La.1985).
In Smith vs. La. Health and Human Resources Administration, 637 S[o].2d 1177, the following was held:
The cited statute is not applicable to this case. The trial court found the State and the hospital itself liable and the medical malpractice cap was not made applicable to the State and its hospitals until 1988. The statu[t]e is not retroactively applicable to this case which involves the 1983 death of Mr. Smith and which was filed in 1983.

In Hampton vs. Greenfield, 576 So.2d 630 (La.App. 4 Cir.1991), Charity Hospital of New Orleans pleaded retroactivity of the statute to no avail.
Charity does not dispute the foregoing conclusions of law where its independent acts of negligence (which Charity contends were never proved) are concerned. Charity does not contest the fact that the damages for which it was held liable by the trial court are governed by the pre-September 9, 1988 statute which did not directly provide a cap for "the State and its hospitals" as noted by the *1377 trial court. Charity protests that the only acts of negligence for which any proof was offered in the trial court and for which Charity could be held liable were acts for which Charity's liability was vicarious only. Charity contends that its vicarious liability is limited to the $500,000.00 cap. We agree. Sibley v. Bd. of Sup'rs of Louisiana State University, 477 So.2d 1094 (La.1985).
In Sibley, at p. 1104, the Supreme Court stated:
Plaintiff refrains from disputing, without conceding, that the statutory prohibition against a malpractice judgment in excess of 500,000 dollars applies to bar his recovery against the LSU Board over this amount based on its vicarious liability for the medical malpractice of its physicians and other health care personnel. The plaintiff is correct in not disputing this issue. The statute in effect limits the LSU Board's vicarious liability because it prohibits any judgment whatsoever based on the malpractice of physicians or other health care personnel in excess of the statutory limit. [Emphasis added.]
... [T]he statute would apply to bar a judgment for damages in excess of the statutory maximum based on either the malpractice of an individual health care provider or the vicarious liability of the LSU Board as his employer ... [Emphasis added.]
Thus, according to Sibley under LSA-R.S. 40:1299.39 no party may be held liable in excess of the statutory limit where the judgment is "based on the malpractice of physicians or other health care personnel" even where that party, such as Charity, is not directly protected by the statutory limit. As applied to the facts of this case this means that Charity's liability is limited to $500,000.00 because Charity's liability is vicarious only and is based entirely upon the malpractice of its physicians or other health care providers. Only if the judgment against Charity were based in whole or in part on grounds other than the malpractice of its physicians or other health care providers, i.e., only if the judgment were based in whole or in part on Charity's independent negligence could Charity's liability exceed $500,000.00.
In his concurring opinion in Sibley at p. 1110, Justice Calogero explicitly agreed with the majority that vicarious liability is covered by the $500,000.00 cap while independent negligence was not. Justice Watson implicitly agreed in his concurring and dissenting opinion. Id.
On the remand of Sibley the First Circuit acknowledged the $500,000.00 cap on vicarious liability as opposed to the unlimited liability for independent negligence. Sibley v. Board of Supervisors of Louisiana State University, 490 So.2d 307 (La.App. 1 Cir.), writ denied, 496 So.2d 325 (La.1986). Therefore, we have the clear language of the Supreme Court to guide us as well as an appellate decision acknowledging this clear language.
Plaintiff argues consistent with the holding of the trial court that the benefit of the $500,000.00 cap did not extend to Charity until LSA-R.S. 40:1299.39(A)(1)(a) was amended by Act No. 786 of 1988 effective September 9, 1988 to cover the State and its agencies, including State hospitals like Charity. As plaintiff's hip injury occurred at the latest in January of 1988, plaintiff contends that Charity is not entitled to the benefits of Act No. 786 of 1988. However, prior to the 1988 amendment, in Williams v. Lallie Kemp Charity Hospital, 428 So.2d 1000 (La.App. 1 Cir.1983), cert. denied, 434 So.2d 1093 (La. 1983), the court anticipated the reasoning to be adopted by the Supreme Court in Sibley, in a case in which the plaintiffs named the state charity hospital as a defendant, but did not name any of the individual employees of the hospital as defendants. The plaintiff specifically argued that the cap did not protect the state charity hospital because it was not among the protected class defined as "persons" in LSA-R.S. 40:1299.39(A)(1).
The significant language is that providing that "in any action or claim for an alleged act of malpractice." [Emphasis added.] The instant suit, though it is against the state, is based on an alleged *1378 act of malpractice.... [Emphasis added.][1]
We designate the present suit a claim for "malpractice" because it is founded on the acts and omissions of LKCH's [Lallie Kemp Charity Hospital] employees who are "health care providers." LKCH was not alleged nor found to be independently negligent, [emphasis added] but was held liable for the unintentional torts of Drs. Sherrod and Yamaguchi and several nurses committed before and during the baby's delivery.
Additionally, La.R.S. 40:1299.39 D provides that "all malpractice claims against the state [emphasis original] shall be submitted to and administered by the Division of Administration." Here again it is evident that the legislature obviously contemplated suits and/or claims against the state.
* * * * * *
Thus we hold that La.R.S. 40:1299.39 is applicable to suits against the state for alleged acts of malpractice committed by its health care provider employees. [Emphasis added.]
Williams v. Lallie, 428 So.2d at 1009.
Thus in both Williams v. Lallie and Sibley the courts determined that the liability cap for "malpractice" by individual health care providers under LSA-R.S. 40:1299.39 extends to those parties having vicarious liability for that malpractice. Thus Williams v. Lallie and Sibley dictate that where the issue is one of vicarious liability, the scope of the class protected by the cap is defined more in terms of how "malpractice" is defined in LSA-R.S. 40:1299.39 than by reference to who is covered under the act.[2] See also Allen v. State, 535 So.2d 903, 914 (La.App. 2 Cir.1988). Indeed, this is the only result that can logically flow from the distinction made in Sibley between malpractice and independent hospital negligence. For there is no way that the state or Charity can be directly liable for malpractice as defined in the act, because malpractice could only be committed by health care providers, who in turn are defined as certain "persons" in the act. Therefore, malpractice claims against the state can only be vicarious in nature, and, as was explained in the language quoted from Williams, supra, malpractice claims against the state all come under the act. The cases cited by plaintiff do not hold otherwise.
Plaintiff argues that this Court should be guided by Felice v. Valleylab, Inc., 520 So.2d 920, 929 (La.App. 3 Cir.1987), writ denied, 522 So.2d 562 and 563 (La.1988), wherein the State was held vicariously liable for the negligence of its surgical resident, and directly liable for the negligence of the Board of Supervisors of Louisiana State University medical school. Felice is not persuasive for the following reasons:
1. The Court did not even consider the issue of whether the $500,000.00 cap applied to vicarious liability.
2. There were sufficient acts of independent negligence proven to support the judgment on the basis of those acts alone.
3. This Court must give greater deference to the pronouncements of the Supreme Court in Sibley than to those of the Third Circuit.
For the same three reasons we find Marcel v. Louisiana State Dept. of Public Health (Dept. of Health and Human Resources), 492 So.2d 103 (La.App. 1 Cir.), writ denied, 494 So.2d 334 (La.1986), unpersuasive. Additionally, we note that the Marcel court ruled that the plaintiff's injuries occurred as a result of the defendants acts of negligence in 1975, but the $500,000.00 cap did not go into effect until 1976.
The decision of this Court in Hampton v. Greenfield, 576 So.2d 630 (La.App. 4 Cir.), writ denied, 581 So.2d 686 (La.1991), was supported by the independent negligence of *1379 Charity. In Hampton this Court found that had it not been for the POLICY of Charity to allow student nurses in their first year to respond to emergency "code" situations the plaintiff, more likely than not, would not have suffered cardiac arrest.
In Martino v. Sunrall, 619 So.2d 87 (La. App. 1 Cir.), writ denied, 621 So.2d 821 (La.1993), the court did not consider the question of independent negligence versus vicarious negligence. In fact, the Martino court refused to even consider the question of liability finding that: "The issue of liability is not before the court at this time." Martino, at p. 90.
In Smith v. Louisiana Health & Human Resources Admin., 93-1434 (La.App. 4 Cir. 5/18/94); 637 So.2d 1177, writ denied, 94-1617 (La.10/7/94); 644 So.2d 634, this Court did not advert to the issue of independent negligence versus vicarious negligence. Although our reading of Smith reveals no findings of fact relied upon by this Court indicative of independent negligence, the wording of the opinion implies that that was how this Court viewed the incident:
The trial court found the state and the hospital itself liable and the medical malpractice cap was not made applicable to the state and its hospitals until 1988. [Emphasis added.]
Smith, p. 23, 637 So.2d at 1193.
Moreover, this Court's opinion in Smith reviewed Charity's assignments of error seriatim, and our reading of that opinion reveals no indication that Charity attempted to argue to this Court, as it has in the instant case, that its vicarious liability is limited to the $500,000.00 cap. In Smith it appears that if Charity and the state were entitled to the $500,000.00 limitation for vicarious liability, neither the state nor Charity raised that argument in the trial court, and/or abandoned it on appeal to this Court.
We also find it significant that none of the cases cited by plaintiff or the trial court attempt to distinguish or to dispute the statement quoted previously from Sibley limiting the vicarious liability of Charity and the State to the $500,000.00 cap. In fact several of those cases rely on Sibley, although admittedly for other reasons.
Therefore, Charity is entitled to benefit vicariously from any "malpractice" cap to which its employees might be entitled under LSA-R.S. 40:1299.39. However, the burden is on Charity to first show that its employees are entitled to the cap before it can get the limitation vicariously.

II. THE BURDEN OF PROOF IS ON CHARITY TO PROVE THAT ITS HEALTH CARE PROVIDERS ARE ENTITLED TO THE STATUTORY LIMIT OF LIABILITY
The Malpractice Liability for State Services Act (LSA-R.S. 40:1299.39 and 40:1299.39.1) must be strictly construed because it grants immunities or advantages in derogation of the general rights available to tort victims. Kelty v. Brumfield, 93-1142 (La.2/25/94); 633 So.2d 1210, 1216.[3]
*1380 At the time plaintiff was injured the Malpractice Liability for State Services Act (MLSSA) applied to "any individual acting in a professional capacity in providing health care services ... acting in the course and scope of his employment, pursuant to a contract with the state or any political subdivision thereof, which contract, specially names that health care provider or his employer ..."
If we assume for purposes of argument that all damages sustained by plaintiff were attributable to "individual[s] acting in a professional capacity in providing health care services ... acting in the course and scope of [their] employment" it is still not enough to prove that those individuals are entitled to the $500,000.00 cap, and through them, Charity. The statute requires that in order to be covered it is not enough to be employed by Charity and act in the course and scope of that employment. The statute in language that still echoes in the current form of the MLSSA (Cf. LSA-R.S.40:1299.39.A(1)(ii)(aa)) imposed the additional requirement that the employment be pursuant to a contract that designated the individual or his employer by name. Had the legislature intended that a mere showing of employment and course and scope be sufficient, there would have been no reason to include the language referring to the contractual requirement. (Cf. LSA-R.S. 23:1031 in the Worker's Compensation Law which imposes a requirement only that the accident arise "out of and in the course and scope of his employment" without any necessity of showing the existence of a specific written employment contract.) Implicit in the requirement that the contract "specially names that health care provider or his employer" is the requirement that the contract be in writing.
As the requirement of a specific written contract called for by the MLSSA cannot be ignored regardless of the standard of statutory construction employed, Charity's employees are only entitled to the benefit of the cap, and through them, Charity, if, and only if, they were acting pursuant to written employment contracts meeting the requirements of the MLSSA. The burden of proving the existence of such qualifying contracts falls on Charity. The record contains no proof of such contracts. Charity attempted to introduce no such proof. Therefore, it was not error for the trial court to deny Charity the benefit of the cap.

III. THE ALLOCATION OF FAULT AMONG SETTLING TORTFEASORS AS A MATTER OF LAW
Charity argues in its brief:
Under the Louisiana Medical Malpractice Act, La. R.S. 40:1299.44(C)(5) provides that once a qualified health care provider (or its insurer) has paid its policy limits of $100,000.00 in settlement of its claim, and the claimant seeks additional recovery from the Patient's Compensation Fund, the court "shall consider the liability of the health care provider as admitted and established."
According to Charity, when Drs. Silvers and Walsh settled, as a matter of law it constitutes, in effect, a stipulation or judicial admission of medical causation making them joint tortfeasors and, therefore, solidary obligors. Charity concludes that it is entitled to have its liability and damages reduced by the percentage for which its joint-tortfeasors are responsible.
The admission of liability asserted by Charity is found in LSA-R.S. 40:1299.44(C)(5), which in turn is found in Part XXIIIMedical Malpractice under Miscellaneous Health Provisions; whereas, LSA-R.S. 40:1299.39.F which applies to Charity and its employees comes under Part XXIAMalpractice Liability for State Services. Therefore, we find that any admissions referred to in Part XXIII do not apply to proceedings under part XXIA.
Moreover, even if we assume for purposes of argument that LSA-R.S. 40:1299.44(C)(5) does apply, we find that there is no admission of liability in the sense argued by Charity.
*1381 The language from LSA-R.S. 40:1299.44(C)(5) quoted above by Charity is the last half of a sentence the first half of which begins, "In approving a settlement or determining the amount, if any, to be paid from the patient's compensation fund the court ..." [Emphasis added.] The admission of liability is only as to the patient's compensation fund and runs in favor of the plaintiff only. There is nothing in the act to suggest that it was intended to confer an evidentiary benefit adverse to the plaintiff upon third parties. The admission of liability was arguably enacted to offset in part the advantages to health care providers of the $500,000.00 cap. Cf. Pendleton v. Barrett, 95-2066, p. 15 (La.5/31/96); 675 So.2d 720, 729. In the instant case the benefit to Charity of the cap would be substantial had Charity succeeded in proving its entitlement to it, because it would have shielded Charity from exposure to approximately $4,000,000.00 out of the $7,206,319.00 awarded by the trial court.
None of the cases cited by Charity hold that the statutorily "admitted" liability may be asserted by third parties, such as Charity, seeking to allocate fault in an effort to reduce their liability to the injured party.
Moreover, we note that had Charity proven its entitlement to the cap, it would have benefited from the payments made by the settling physicians because the amounts for which they settled go towards the $500,000.00 malpractice cap, i.e., the plaintiff is entitled to only $500,000.00 in the aggregate for the injury done his hip arising out of malpractice. For one patient and one injury there is but one cap. Cf. Merritt v. Karcioglu, 95-1336, p. 18 (La.App. 4 Cir. 1/19/96); 668 So.2d 469, 480, affirmed as amended (quantum reduced), 96-0431 (La.2/25/97); 687 So.2d 1002. Thus, in effect, an allocation in favor of Charity takes place automatically because of the way the cap (had Charity proven its entitlement thereto) operates in the aggregate. In addition, Charity has the right to prove a more favorable allocation based on the facts, if it canbut the burden to do so is on Charity.
It is enough that Charity receives (had it proven its entitlement to the cap) the benefit of the $500,000.00 cap vicariously in derogation of the common right of a tort victim to recover his damages in full, plus credit towards that cap for what was received in settlement from other health care providers (in effect, an automatic allocation), plus the right to attempt to prove a more favorable allocation. Before this Court will allow Charity the further benefit of allocating fault based on the legal fiction of a statutory admission of liability, the legislature must explicitly and unambiguously mandate such a result in further derogation of the common right. The legislature did not do so. The application of medical malpractice caps is to be strictly construed against limiting the tort claimant's right against the wrongdoer. This is true regardless of whether the cap is found in Part XXI-A of Title 40 or Part XXIII of Title 40. Kelty, 633 So.2d at 1216.

IV. ALLOCATION OF FAULT AS A MATTER OF FACT.
Charity admits in its brief that, "The septic hip ... left Oniate severely injured." Charity's brief also states that: "Charity does not dispute that it failed to diagnose Oniate's septic hip on January 12, 1988." However, Charity contends that under the doctrine of comparative fault the vast majority of the fault should be allocated to other parties involved in Oniate's treatment.
Plaintiff contends comparative fault is an affirmative defense which Charity failed to plead. Plaintiff concludes that Charity is, therefore, barred from asserting the negligence of the plaintiff or anyone else in mitigation of its own negligence. Regardless of the nature of the allegations made by Charity in its pleadings, pleadings may be enlarged to include affirmative defenses not specifically pleaded where evidence supporting such a defense is introduced without objection. LSA-C.C.P. art. 1154; Pierre v. Lallie Kemp Charity Hosp., 515 So.2d 614, 617 (La.App. 1 Cir.), writ denied, 515 So.2d 1111 (La.1987). We find that in this case evidence to support Charity's defenses of comparative negligence was admitted without objection and that Charity's pleadings were thereby effectively enlarged in that regard. We will, therefore, permit Charity to assert *1382 its defenses of comparative negligence, but for the reasons hereinafter set forth, we find Charity's defenses of comparative negligence to be without merit.
Oniate saw two orthopedists, Drs. Adatto and Manale, before arriving at Charity on January 12, 1988. Oniate returned to Dr. Manale on January 18 and again on January 26 when the septic hip was diagnosed. On January 26, 1988, Oniate returned to Charity and received treatment for the septic hip. Oniate does not fault Charity for Charity's post diagnosis treatment of his septic hip.
On October 20, 1987 an annuler pancreas which created a blockage of Oniate's duodenum was bypassed successfully surgically at St. Jude Hospital. However, Oniate suffered a staph infection possibly caused by a contaminated feeding tube. He was given a five day course of I.V. antibiotics and discharged in mid-November because he had no fever or other symptoms of an infection and a normal white blood count. The trial court found no malpractice in Oniate's discharge by St. Jude at that time based on these facts. We find no manifest error in that finding. However, unknown to anyone the staph infection had apparently settled surreptitiously in Oniate's right hip.
The trial judge noted that Dr. Charles Sanders an expert in infectious diseases testifying for Charity found no fault with the care provided by St. Jude. The trial court found insufficient proof in the record to establish that the delay in changing the feeding tube was, more likely than not, the cause of the staph infection. This conclusion that St. Jude, Dr. Walsh and Dr. Silver were not negligent is supported by the testimony of Dr. Ronald Nichols who testified that the antibiotic treatment that Oniate received at St. Jude for his infection was not of an inappropriately short duration based on the standards of 1987. According to Dr. Nichols it would have been accepted practice just to remove the catheter which was all that was normally necessary. The trial court chose to place greater weight on this testimony of Dr. Nichols, and implicitly on that of Drs. Walsh and Silvers themselves, than on conflicting testimony offered by other doctors. In reviewing contrasting expert testimony, the trier of fact has the responsibility to determine which evidence is most credible. Miller v. Miller, 602 So.2d 330, 332 (La.App. 4 Cir.1992). We cannot say that the trial judge was manifestly erroneous or clearly wrong after reviewing the record as a whole. All objective evidence at the time of Oniate's discharge from St. Jude indicated that the infection had cleared up. Oniate had no fever, his white blood count was returning to normal, and he looked and felt good.
Charity argues that Oniate's own negligence contributed to his hip injury. Charity contends that when plaintiff took Orudis, which is now an over the counter pain killer, it set in motion a series of events which resulted in the surgery leading to Oniate's hip infection. The trial court found no causal relationship, and we find no manifest error in this finding. The trial court implicitly found no connection between Oniate's behavior and what Charity argues was his premature discharge from St. Jude and consequent premature termination of his antibiotic treatment. We find no manifest error in these implicit findings of the trial court.
Charity argues that Dr. Manale and his partner, Dr.Adatto, saw Oniate with the same symptoms immediately before and after Charity did. Charity concludes, therefore, that if the failure of Charity's orthopedists to diagnose the osteomyelitis was malpractice, then Drs. Manale and Adatto were equally negligent in their failure to diagnose.
Dr. Adatto saw Oniate on December 30, 1987 complaining of tenderness in the lower back. Dr. Adatto noted that Oniate had right knee pain for which he could not articulate a reason. (The knee pain disappeared a few days later.) Dr. Adatto instructed Oniate to return to see Dr. Manale, protect the lower back area, and use heat. There is nothing in connection with this visit to Dr. Adatto from which we could say that the trial court was manifestly erroneous in not finding that Dr. Adatto committed malpractice when he failed to diagnose the hip infection on December 30, 1987. The symptoms which Oniate presented to Dr. Adatto on that date *1383 were consistent with those Oniate had experienced for several years since his automobile accident. Nor do the symptoms exhibited by Oniate to Dr. Adatto on December 30, 1987 compel a finding that the hip was already deteriorating as of that date. Therefore, we cannot say that the finding of the trial court that "sepsis was dormant until it re-manifested itself on January 9, 1988" when plaintiff first began experiencing pain in his hip is manifestly erroneous.
Oniate began to experience pain in the infected hip in early January 1988. On January 11, 1988, Oniate went to see Dr. Bernard L. Manale, the orthopedic surgeon who had previously performed neck surgery on him arising out of his 1982 automobile injury. That surgery had been funded by the attorneys representing Oniate in the automobile accident litigation, but they informed Dr. Manale that they would not fund treatment for the hip as it had no relationship to the litigation injury. For that reason and because Oniate needed hospital testing, including blood tests, Dr. Manale referred Oniate to Charity.
The record supports plaintiff's position that Dr. Manale never undertook to treat Oniate's hip condition and was under no duty to do so. In the opinion of Dr. Razza, an expert in orthopedics, Dr. Manale did not undertake to treat Oniate's hip and his referral to Charity under the circumstances was appropriate. Both Dr. Manale and Oniate understood at all times that Dr. Manale was not treating Oniate's hip condition. Moreover, Oniate's hip condition required a hospital work-up. Both Dr. Manale and the plaintiff were relying on Charity where the work-up was done. When Oniate saw Dr. Manale again on January 18, 1988, Dr. Manale was told that Charity had performed a complete diagnostic work-up, including x-rays, blood work, etc., and had sent Oniate home. The x-rays were negative. On January 18, 1988 it was not unreasonable for Dr. Manale to rely on the fact that Oniate had been examined at Charity only a few days before, especially in connection with a condition for which Dr. Manale was not treating Oniate.
Oniate next saw Dr. Manale on January 26, 1988. Dr. Manale did not undertake treatment of the hip at this time. Instead, Dr. Manale referred Oniate directly to Charity for appropriate treatment which he received. (Oniate has no further complaints about his treatment at Charity from January 26 forward.) Dr. Razza testified that Dr. Manale's actions breached no standard of care. Dr. March testified in a similar fashion with the exception of noting a one time erroneous prescription of Orudis made by Dr. Manale's office which has not been shown to have any causal relationship to Oniate's hip injury.
Charity's records of January 11 and 12, 1988 show that Oniate was admitted with "severe right leg pain" which started on January 9, 1988. Fever and chills were noted. A blood test showed a dangerously high sedimentation rate of 64, but was mistakenly listed at a rate of 20 which is within the acceptable range. Regardless, the examiner suspected an infected hip. However, an orthopedic examination on January 12, 1988 resulted in a diagnosis of "possible lumbar strain." Based on this diagnosis Oniate was sent home without treatment for the hip infection and told to return in two weeks. In two weeks he returned in an ambulance in great pain. Two surgeries were performed on the hip, but for all practical purposes the hip joint is destroyed beyond surgical replacement.
Plaintiff presented expert testimony to establish that the hip was destroyed in the interval between Oniate's discharge by Charity on January 12, and the time Oniate returned two weeks later. Charity could and should have diagnosed the hip infection on January 12. Charity's failure to diagnose the infection was malpractice. Had Charity diagnosed the hip injury on January 12, more likely than not Oniate's hip could have been saved. Charity does not deny that its failure to diagnose was a cause of the injury.
Charity argues that Oniate was instructed to return to Charity prior to January 26 if the pain worsened. Charity called no one to testify to that. Charity's records in this regard are ambiguous. We find no manifest error in the trial court's finding that *1384 when Oniate left Charity on January 12, he was told to return in two weeks. Oniate testified to that effect, and that is how Dr. March, an expert in orthopedics, interpreted Charity's records.
Charity states in its brief that: "According to plaintiff's expert orthopedic surgeon, Dr. Clark McKeever, Charity Hospital is responsible for approximately 23.75% of Oniate's hip damages." Dr. McKeever never suggests anything of the kind. Dr. McKeever's testimony was that at the time Oniate presented himself at Charity on January 11, 1988, his hip was virtually undamaged. From this Charity infers that Dr. McKeever's testimony implies that Charity is only 23.75% responsible on a comparative negligence basis based on Charity's theory of fault allocation, not on any fault allocation asserted by Dr. McKeever.
Immediately following Charity's argument based on Dr. McKeever's testimony to the effect that the hip was virtually undamaged as of January 11, 1988, Charity contends that "the damages were already irreparable by the time he reached Charity." Charity concludes this part of its argument as follows:
Evidence in the record indicates that Oniate's hip destruction was well under way, and this Court could reasonably assign little or no fault to Charity based on that evidence.
This inconsistency in Charity's position demonstrates just how much this is a classic manifest error case. In order for Oniate to prevail on this appeal it is not necessary that we find that there is only one permissible view of the evidence. We need only find after reviewing the record as a whole that the view taken by the trial court was reasonable. That the record might permit other reasonable views (e.g., that the hip was already beyond repair or severely damaged prior to the time Oniate first presented himself to Charity on January 11, 1988), depending on credibility calls and decisions on how to weigh the evidence, does not constitute manifest error.
Where two permissible views of the evidence exist, the factfinder's choice between them cannot be manifestly erroneous or clearly wrong. Stobart v. State through Dept. of Transp. and Development, 617 So.2d 880, 883 (La.1993). The issue to be resolved by the reviewing court is not whether the trier of fact was right or wrong, but whether the factfinder's conclusion was a reasonable one. Id. at 882. The reviewing court may not disturb reasonable evaluations of credibility and reasonable inferences of fact when viewed in light of the record in its entirety even though it feels its evaluations are more reasonable. Id. We may only find manifest error where a reasonable factual basis for the findings of the factfinder does not exist. Lewis v. State through Dept. of Transp. and Development, 94-2370 (La.4/21/95); 654 So.2d 311, 314. This may occur where documents or objective evidence so contradict a witness's story, or the story itself is so internally inconsistent or implausible on its face, that a reasonable fact finder would not credit the witness's story. Rosell v. ESCO, 549 So.2d 840 (La.1989). Such is not the case here.
Regardless of how Charity might characterize its case for purposes of argument, the thrust of Charity's case is that Charity does not agree with the trial court's decisions regarding the relative weight to be accorded to the testimony of differing experts and the reasonable inferences to be drawn from the testimony and evidence. Charity has not demonstrated the existence of such legal errors as would have tainted the fact finding process, nor has Charity shown that the trial court's findings of fact were manifestly erroneous or clearly wrong. In short, Charity has offered nothing that would warrant a de novo review by this Court. In the absence of a de novo review we are constrained from substituting our judgment for that of the trial court, even though we may feel that our evaluations and inferences are as reasonable and would lead us to a different result. Canter v. Koehring Co., 283 So.2d 716, 724 (La. 1973).
The trial court offered extensive and well thought out reasons for judgment. More importantly, our review of the record as a whole supports the findings and judgment of the trial court.

*1385 V. THE GENERAL DAMAGE AWARDS AND LOSS OF EARNING CAPACITY
Charity complains that Oniate was in a depressed state prior to the injury and that a substantial portion of the trial court award for mental suffering was really attributable to pre-existing psychological problems. The trial judge explained his reasons for damages thoroughly and at length. Throughout the section on damages of his written reasons the trial judge constantly references Oniate's hip injury. It is abundantly clear that the trial court distinguished between the hip injury for which Charity is responsible and pre-existing injuries and problems, some of which he alludes to specifically, for which Charity is not responsible. The trial court at the outset acknowledged Oniate's previous divorce, loss of a child at birth, a neck injury in 1982, and surgeries in 1983 and 1986. Charity complains that the trial court's general damage award implicitly and erroneously included sums for pain and suffering in connection with Oniate's pre-existing neck problems. But the trial court's reasons for judgment make no reference to neck problems, only the destroyed hip. Moreover, although Oniate is not entitled to damages for pre-existing conditions, he is entitled to damages to the extent that Charity aggravated and exacerbated those conditions. We conclude that no portion of the trial court award for general damages improperly included pre-existing injuries.
Next we must determine whether the award for general damages was excessive. The trial court awarded plaintiff $2,000,000.00 for physical pain and suffering; $2,000,000.00 for mental and emotional pain and suffering, risks and fears. Charity argues that these awards are excessive.
The standard of review for general damages is as expressed in Youn v. Maritime Overseas Corp., 623 So.2d 1257, 1261 (La. 1993) cert denied, Maritime Overseas Corp. v. Youn, 510 U.S. 1114, 114 S.Ct. 1059, 127 L.Ed.2d 379 (1994):
The standard for appellate review of general damage awards is difficult to express and is necessarily non-specific, and the requirement of an articulated basis for disturbing such awards gives little guidance as to what articulation suffices to justify modification of a generous or stingy award. Nevertheless, the theme that emerges from Gaspard v. LeMaire, 245 La. 239, 158 So.2d 149 (1963) through Coco v. Winston Industries, Inc., 341 So.2d 332 (La.1976) and through Reck [v. Stevens, 373 So.2d 498 (La.1979)] to the present case is that the discretion vested in the trier of fact is "great," and even vast, so that an appellate court should rarely disturb an award of general damages. Reasonable persons frequently disagree about the measure of general damages in a particular case. It is only when the award is, in either direction beyond that which a reasonable trier of fact could assess for the effects of the particular injury to the particular plaintiff under the particular circumstances that the appellate court should increase or reduce the award. Youn v. Maritime Overseas Corp., 623 So.2d 1257 (La.1993).
The role of the appellate court in reviewing general damages is not to decide what it considers to be an appropriate award, but rather to review the exercise of discretion by the trier of fact. Youn at 1260. In effect, the award must be so high or so low in proportion to the injury that it "shocks the conscience." Moore v. Healthcare Elmwood, Inc., 582 So.2d 871 (La.App. 5 Cir.1991). The initial inquiry is whether the award for the particular injuries and their effects under the particular circumstances on the particular injured person is a clear abuse of the "much discretion" of the trier of fact. Gaspard v. LeMaire, 245 La. 239, 158 So.2d 149 (1963); Ballard v. National Indem. Co. of Omaha, Neb., 246 La. 963, 169 So.2d 64 (1964); Lomenick v. Schoeffler, 250 La. 959, 200 So.2d 127 (1967). Only after such a determination of an abuse of discretion is a resort to prior awards appropriate and then for the purpose of determining the highest or lowest point which is reasonably within that discretion. Coco v. Winston Industries, Inc., 341 So.2d 332 (La.1976); Bitoun v. Landry, 302 So.2d 278 (La.1974); Spillers v. Montgomery Ward & Co., 294 So.2d 803 (La.1974); Youn, supra.
*1386 Plaintiff is in intractable, "immense"[4] and chronic pain as a result of the destruction of his hip. Dr. Barnes testified that:
The pain affects every aspect of his life. He has difficulty with just the ordinary activities of daily living.
Oniate cannot sit in one position and is constantly shifting his position. He can't bear weight. He can't bend down enough to put on his socks. He must use a coat hanger to do so, and then only with difficulty. He has trouble with all aspects of dressing and toileting. He walks with a cane and only with difficulty and pain. He can only walk about a block without being fatigued. He is unable to work. Because of the awkward way in which he has to sit and walk, back problems are virtually certain to develop. Plaintiff had to undergo two surgeries and a painful physical therapy. The hip joint has totally disintegrated and is beyond replacement. He was in a body cast and forced to lie on his back for almost three months during which time he developed painful bedsores. He was in a poor emotional state prior to this, and the problems connected with his hip damage caused him to become severely depressed to the extent that at times he wanted to die. His emotional prognosis is not good because his physical condition is likely to deteriorate in the future as the bone continues to erode and his injured leg continues to shorten.
Charity criticizes the trial court for relying on Bernard v. Royal Ins. Co., 586 So.2d 607 (La.App. 4 Cir.1991), in which this Court sustained a general damage award of $4,025,000.00 for damages which Charity argues were much worse than those sustained by Oniate. In affirming this award this Court did not say in Bernard that $4,025,000.00 was the maximum possible reasonable award under the circumstances. Additionally, we note that Bernard was decided six years ago and there has been inflation in the economy since that time. Ms. Bernard's award today on an inflation adjusted basis would be significantly greater. Therefore, we conclude that Ms. Bernard could have received a greater general damage award without exceeding the great and vast discretion of the factfinder and without shocking the conscience; and that in terms of today's dollars the award to Ms. Bernard for general damages was significantly greater than that affirmed by us for Oniate. In effect, contrary to the arguments made by Charity, the trial court awarded Oniate substantially less than was awarded to Ms. Bernard, presumably because the trial judge did just what Charity complains he did not do, i.e., he took into account the fact that Ms. Bernard's injuries and sufferings were somewhat more grievous than those of Oniate.
Moreover, we note that Bernard contains a number of comments of value to the instant case:
We hold that the jury's award cannot be excessive, ipso facto, simply because of its size. See Reck v. Stevens, 373 So.2d 498 (La.1979).
Id., 586 So.2d at 613.
General damages do not have a common denominator and are determined on a case by case basis.... Factors to be considered in assessing quantum for pain and suffering are severity and duration.... It is impossible for a judge or jury to fully compensate for the loss of a normal human life.
Id., 586 So.2d at 617 and 618.
After reviewing the facts of Bernard and the injuries and sufferings of Ms. Bernard as described by this Court, we find that Bernard bears a reasonable relationship to the instant case. Therefore, we cannot say that the trial court's use of Bernard as a frame of reference is unreasonable.
Charity argues that Oniate's damage to his hip pales next to the damages sustained by the plaintiff in Poche v. State, Through Dept. of Trans. and Development, 93-0369 (La. App. 1 Cir. 3/11/94), 633 So.2d 913, writ denied 637 So.2d 1071 (La.5/13/94), in which the plaintiff was paralyzed from the waist down in an automobile accident. But the Poche court held that "$3,000,000.00 is the lowest reasonable amount to compensate Mr. Poche in general damages." Id., 633 So.2d at 917. We can safely assume that the Poche court would have found that the highest *1387 reasonable amount was far in excess of $3,000,000.00. Moreover, we note that although substantial pain might be associated with such an injury and the medical procedures involved, there is no specification of such pain in the opinion. The impression one gets from reading Poche is that it was based largely on the fact of permanent paralysis rather than a prognosis of unrelenting and intensifying physical pain, as there is no mention of that kind of pain. It is entirely possible to be paralyzed without facing a lifetime of excruciating pain. As the standard for awarding general damages is the effect that the particular injury has on the particular plaintiff before the court, we cannot say that the trial judge was manifestly erroneous if he concluded that Mr. Oniate was suffering more than the plaintiff in Poche. That is the type of judgment call that the trial judge who actually got to see and hear Mr. Oniate is in a much better position to make than is this Court.
Charity cites Martino v. Sunrall, 619 So.2d 87 (La.App. 1 Cir.), writ denied 621 So.2d 821 (La.1993), in which a student paralyzed in a diving accident was awarded $2,500,000.00 for general damages. First we note that this was the amount awarded by the trial court and the defendant did not even attempt to question that amount on appeal. The only damage awards alleged to be excessive on appeal were for medicals and loss of wages. Perhaps the defendants felt that they were lucky in being cast for only $2,500,000.00 in general damages under the circumstances. It is likely that a far greater amount of general damages might have been sustained on appeal as being within the great and vast discretion of the trial court.
Additionally, we infer from the brief statement of the facts found in Martino that although the plaintiff was paralyzed, he was not in any appreciable amount of physical or mental pain as no reference is made to those items. Nor is any reference made in Martino to facts that would imply pain and suffering, e.g., numerous surgeries, etc. We infer that the general damages sustained by the plaintiff in Martino were more in the nature of loss of enjoyment of life and difficulty in performing the simple, everyday, routine tasks of living rather than actual pain. Had the trial judge in the instant case concluded that the impact of the mental and physical pain on Mr. Oniate was greater than the impact of the paralysis on the plaintiff in Martino, we cannot say that such a finding is manifestly erroneous. Moreover, Mr. Oniate's ambulatory ability is so limited and difficult that even without constant pain his mobility is not significantly greater or better than that of someone confined to a wheelchair.
In Williams v. Jefferson Parish Hosp. Serv. Dist. No. 2, 604 So.2d 1046 (La.App. 5 Cir.1992), the appellate court sustained a trial court award of $500,000.00 for the loss of a leg. The court noted that:
Because of the injury, he can no longer drive his tractors or automobile, and must be chauffeured about by his children. He has other problems in caring for his daily needs and getting about the house. Further, he testified that prior to the surgery, he had problems with his right leg and depended on the strength of his left leg to keep him mobile. The loss of the left leg has thus had the effect of rendering him almost completely immobile, even with the use of a prosthesis and walker. Considering all of these circumstances we do not find the award so high as to constitute the trier of fact's much discretion.
Id., 604 So.2d at 1051.
There is no mention in Williams of any physical or mental pain and suffering. What physical limitation can compare to Oniate's prospect of a lifetime of intensifying incessant physical pain and suffering?
In Richardson v. Continental Ins. Co., 468 So.2d 675 (La.App. 3 Cir.1985) the appellate court reduced the lump sum damages award from $898,467.00 to $429,833.63. This reduction was based almost entirely on the fact that the loss of future income projections upon which the jury apparently relied were based upon demonstrably false assumptions. The plaintiff was found to suffer from only a 10% permanent-partial disability. The court found that Richardson could return to work, although not as an oil field roustabout. We infer that the court found that Richardson's injuries were basically healed and that his *1388 residual physical pain and suffering would not be dramatic. Physical therapy and psychological counseling for Richardson were only projected for a short duration. Richardson provides no guidance to this court in the instant case. Richardson does not conjure up visions of an injured plaintiff facing a lifetime of physical and mental torture arising out of his injuries, which is the future the trial court could have reasonably envisioned for Oniate in the instant case.
The physical limitations a plaintiff experiences as a result of injury relate to loss of earnings and earnings potential more than to physical pain and suffering. The criteria by which such physical limitations may be judged are relatively objective, e.g., they may be expressed in terms of a certain percentage of disability. On the other hand, general damages related to a plaintiff's mental and physical pain and suffering arise out of a plaintiff's individual subjective reaction to the injuries he sustains. Therefore, two individuals who sustain the same objective level of disability may experience vastly different levels of subjective pain and suffering.
In the instant case our review of the record as a whole reveals no manifest error in the trial judge's finding of physical and mental pain and suffering. This does not mean that a trial judge cannot consider the degree of disability as a factor in determining the extent of mental and physical pain and suffering to the extent the nature of the disability may cause or be proof of suffering. But there is no basis to the argument that all those who lose the use of a leg experience the same degree of pain and suffering even if they do experience the same degree of disability. A leg paralyzed by a severed nerve may produce no physical pain at allin fact the limb may be dead to all feeling. Losing the use of a leg in such a manner is very different from the chronic pain experienced by Oniate, even though the level of physical disability may be the same.
There is an old saying that it is not so much what life sends us as how we deal with it, and apparently Oniate is not good at coping. But the law does not require that he be. Louisiana law does not impose a requirement of stoicism on plaintiffs. We are convinced that most plaintiffs would gladly give up any monetary award for pain and suffering in exchange for corresponding relief from their sufferings. Those who would argue otherwise do so from the tacit premise that such plaintiffs are really not suffering as much as they have convinced the fact finder they are. But that is a matter of proof. Had Charity been able to show that the record as a whole does not support a reasonable finding that Oniate looks forward to a life of physical and mental pain and suffering, we would have reversed for manifest error.
In Dobson v. Aetna Cas. & Sur. Co., 484 So.2d 976 (La.App. 3 Cir.1986), the plaintiff sustained severe leg injuries requiring several past and future painful operations. Plaintiff was awarded $465,000.00 in general damages. But the court refers only to pain in connection with the operations and the initial injury. There is no implication that Dobson is facing a lifetime of chronic pain like Oniate. There is no mention of the kind of psychological distress Oniate is experiencing. In fact we can only infer that Dobson has done an excellent job of coping as he was able to continue in the managerial functions of his job in spite of being unable to perform the physical duties he did prior to injury and he even had increases in salary. Finally, we note that the appellate court did not say a larger award would have been manifestly erroneous. The appellate court ruled only that "under the circumstances of this case the trier of fact did not abuse its much discretion." Dobson, 484 So.2d at 983.
This careful analysis of the cases cited by Charity furnishes this court with no basis for concluding that the trial court made an error in fact or law in fixing the amount of general damages awarded to Oniate.
After reviewing the record as whole as we are directed to do by Ambrose v. New Orleans Police Dept., Ambulance Service, 93-3099 (La.7/5/94), 639 So.2d 216, 221, we have no doubt that the great and vast discretion afforded the trial court in assessing damages under Youn v. Maritime Overseas Corp., 623 So.2d 1257, 1260 (La.1993), cert. denied, 510 U.S. 1114, 114 S.Ct. 1059, 127 L.Ed.2d 379 (1994), was not abused.
*1389 That an award exceeds previous awards does not make it excessive per se:
In Reck, this court disapproved the appellate court's simply reviewing the medical evidence and then concluding that the award for those injuries was excessive, without taking into consideration the particular effect of the particular injuries on the particular plaintiff. This court further disapproved of the use of a scale of prior awards in cases with generically similar medical injuries to determine whether the particular trier of fact abused its discretion in the awards to the particular plaintiff under the facts and circumstances peculiar to the particular case. The initial inquiry is whether the award for the particular circumstances on the particular injured person is a clear abuse of the "much discretion" of the trier of fact. [Citations omitted.] Only after such a determination of an abuse of discretion is a resort to prior awards appropriate and then for the purpose of determining the highest or lowest point which is reasonably within that discretion. [Citations omitted, emphasis added.]
[T]he discretion vested in the trier of fact is "great," and even vast, so that an appellate court should rarely disturb an award of general damages. Reasonable persons frequently disagree about the measure of general damages in a particular case. It is only when the award is, in either direction, beyond that which a reasonable trier of fact could assess for the effects of the particular injury to the particular plaintiff under the particular circumstances that the appellate court should increase or reduce the award.
Youn v. Maritime Overseas Corp., 623 So.2d 1257, 1260-61.
In effect, the award must be so high or so low in proportion to the injury that it "shocks the conscience." Moore v. Healthcare Elmwood, Inc., 582 So.2d 871 (La.App. 5 Cir. 1991).
Applying the language of Youn to this case we find that:
The awards are not obviously the result of passion or prejudice, and they bear a reasonable relationship to the elements of the proved damages. Many rational triers of fact could have decided that a lower award is more appropriate, but we cannot conclude from the entirety of the evidence ... viewed in the light most favorable to the prevailing party in the trial court, that a rational trier of fact could not have fixed the awards of general damages at the level set by the trial judge or that this is one of those "exceptional cases where such awards are so gross as to be contrary to right reason." Bartholomew v. CNG Producing Co., 832 F.2d 326 (5th Cir.1987). [Emphasis added.]
Youn v. Maritime Overseas Corp., 623 So.2d 1257, 1261 (La.1993).

VI. LOSS OF EARNING CAPACITY
The trial court awarded Oniate $449,821.00 for loss of earning capacity.
Charity complains about the award for loss of earning capacity because Oniate has not held jobs for an extended period of time in the past. Oniate's expert opined that Oniate could earn $4.67 per hour, plus fringe benefits. Charity offered no countervailing testimony. Instead Charity chose to rely on the expectation that Oniate would fail to carry his burden of proof. Reasonable men might differ about the expectation that Oniate might have the capacity for steady employment in the future, but we cannot say that the trial judge was manifestly erroneous in concluding that such an expectation was reasonable.
Charity's argument seems to be more that it is unlikely that Oniate would have worked consistently based on his past erratic work history, than that he would not have had the capacity to do so had he not been injured. But that is not the standard by which such awards are judged. The award is not based upon the expectation of whether Oniate would have worked consistently, but the expectation that he would have had the capacity to do had he not been injured. It is an award for loss of the capacity to earn, not an award for the loss of earnings. Socorro v. Orleans Levee Bd., 561 So.2d 739 (La.App. 4 *1390 Cir.1990); Folse v. Fakouri, 371 So.2d 1120, 1124 (La.1979).
In addition to plaintiff's economist, plaintiff produced two witnesses who testified as to Oniate's pre-injury earnings potential as a musician, and a vocational expert who testified that Oniate would have an earning capacity in clerk-type jobs of $4.24 to $6.00 per hour, increasing within a couple of years up to the $8.00/hour range. There was also evidence that Oniate had earned more at times prior to his hip injury. Based on such testimony, we cannot say that the projections made by Oniate's economist based on $4.67 per hour were unreasonable. Cf. Vanzant v. N.O.P.S.I., 517 So.2d 1252, 1254, 1255 (La. App. 4 Cir.1987).

VII. FUTURE HEALTH CARE COSTS
The trial court awarded plaintiff $2,700,000.00 for "Future Health Care Costs." "Future medical care and related benefits" are not subject to the $500,000.00 cap under LSA-R.S. 40:1299.29. Charity's briefs contain no reference to this item of damage. Therefore, we conclude that Charity does not dispute this figure and has abandoned the issue. Uniform RulesCourts of Appeal, Rule 2-12.4.

VI. PAST MEDICAL EXPENSES
The trial court awarded plaintiff $54,432.00 for past medical expenses. Charity contends that it is entitled to have this figure reduced by $8,707.61, which is the amount of its medical bill. In other words, plaintiff is attempting to collect from Charity the amount he owes Charity so that he can pay Charity. We find that the plaintiff is entitled to the award for past medical expenses, including Charity's bill for $8,707.61. This makes Charity both the obligor and the obligee on that bill, thereby extinguishing it by confusion. LSA-C.C. art. 1903.
Charity does not contest the balance of the amount of past medical expenses.
Therefore, we shall reduce the award to plaintiff for past medical expenses to $45,724.39 and declare that Charity's bill has been extinguished by confusion.

DECREE
For the foregoing reasons the judgment of the trial court is amended to reduce the sums awarded for past medical expenses from $54,432.00 to $45,724.39. In all other respects the judgment of the trial court is affirmed.
AFFIRMED AS AMENDED.
MURRAY, J., concurs with reasons.
MURRAY, Judge, concurring:
Although I agree with the conclusion reached by the majority, I do not agree with the majority's statement that Dr. Manale had no duty to treat Mr. Oniate. Dr. Manale had been Mr. Oniate's treating physician, albeit for a neck injury, for four years prior to this problem. He was very much in tune with Mr. Oniate's myriad complaints of pain, and was perhaps in the best position to recognize a potentially serious condition.
However, based on my reading of the record, I do not believe that Dr. Manale was negligent in his actions. He promptly referred Mr. Oniate to Charity Hospital for treatment, and began steps to treat Mr. Oniate when it appeared that Charity had dropped the ball. Even had Dr. Manale contacted Charity to ascertain the results of the blood tests, he would have been given the results as incorrectly read by Charity, and would not have known Mr. Oniate's true condition.
For these reasons, I respectfully concur.
NOTES
[1] Thus it is apparent that Oniate cannot circumvent the cap by naming Charity as a defendant without naming Charity's employees who actually committed the acts of malpractice for which Oniate now seeks to hold Charity vicariously responsible.
[2] Where the statute intentionally omits to extend the cap to the State and its agencies, the logic of allowing the State and Charity the vicarious benefit of the cap escapes this Court. However, we cannot escape Sibley, Williams and Allen, but must content ourselves with the knowledge that the 1988 amendments to LSA-R.S. 40:1299.39 have eliminated this inconsistency.
[3] The Supreme Court in Kelty v. Brumfield was obviously unimpressed by the language found in LSA-R.S. 40:1299.39 D as amended by Act 786 of 1988 indicating that the right to sue the state or a public entity such as Charity is not to be found in the Louisiana Civil Code, as that code according to the language of Act 786 was,

enacted only in the domain of private law, governs only the legal relationships of private persons among themselves alone, and is inapplicable to public entities and their legal relationships, there is no right nor legal basis ex delicto, or ex quasi-delicto, for an action in a patient or his representative to recover damages or any other losses ... from the state or a state health care provider ... as a result of malpractice in connection with state-provided or state-related health care; however, a patient... shall have a right to recover from the state... as a special substantive sui generis statutory grant in the domain of public law. [Emphasis added.]
This language (which remains unaltered in the law today) indicates that the right to recover from the state or a state health care provider under the cap should be viewed as a grant of special rights to the patient that did not exist prior to the enactment of the Malpractice Liability for State Services Law and, therefore, should not be considered as being in derogation of the patient's LSA-C.C. art. 2315 tort rights as the patient had no such rights against the state or a state health care provider. From this it could be argued that if there is to be any bias in the statutory construction of the act, it should be in favor of the state and its health care providers rather than the patient.
However, as noted at the outset that is not the view adopted by our Supreme Court, so it shall not be the view adopted by this court.
[4] Testimony of Dr. Barnes.